SHAWVER, Plaintiff-Appellant, v. ROBERTS CORPORATION, Defendant-Respondent.

Supreme Court

*No. 76–676. Argued May 30, 1979.—Decided June 29, 1979.*
(Also reported in 280 N.W.2d 226.)

674

For the appellant there were briefs by *J. Richard Long*, attorney, of Beloit, and *Theodore R. Postel*, of counsel, of Chicago, Illinois, and oral argument by *Mr. Long* and *Mr. Postel*.

For the respondent there was a brief by *Richard E. Rosenberg* and *Nowlan, Mouat, Lovejoy, Wood & Cripe* of Janesville, and oral argument by *Mr. Rosenberg*.

DAY, J. This is a product liability case. The jury found in favor of the defendant Roberts Corporation, which designed and manufactured a conveyor on which the plaintiff, Elim Luther Shawver, was injured. Mr. Shawver appeals from a judgment entered on the verdict on March 4, 1977.

The questions on appeal are:

1. Was there credible evidence in the record to support the jury's finding that the conveyor, when it left the hands of the manufacturer was not in such defective condition as to be unreasonably dangerous to the buyer or its employees?

2. Was there credible evidence in the record to support the jury's finding that the Roberts Corporation was not negligent in designing, manufacturing, or assembling the conveyor, failing to give a warning as to the danger of the conveyor, or failing to provide the buyer with adequate plans, specifications, instructions and directions for the safe installation of the conveyor?

3. Did the trial court abuse its discretion in refusing to grant a new trial?

Elim Luther Shawver was working as a molder's helper in the foundry at the Beloit Corporation on February 21, 1973 when his right foot was crushed in an accident. As a result of his injuries, it became necessary to amputate his right foot above the ankle.

At the time of the accident, Mr. Shawver was standing on the metal deck of a conveyor, cleaning out a mold (also called a flask) used to make castings. The conveyor was about eight feet wide, sixty-three feet long and one and one-half feet above the floor. A fellow worker mistakenly thought that Mr. Shawver had signalled to move the conveyor, and pressed the button to start the equipment. This caused the mold to move forward onto Mr. Shawver's foot, crushing it. He had no warning that the conveyor was going to be started.

The conveyor was designed, manufactured and sold to the Beloit Corporation as a combination work platform and conveyor. It consisted of rollers spaced about twelve inches apart. Between the rollers there was a grating for workers to stand on.

The quotation from the Roberts Corporation, dated March 8, 1966 provided the following:

"We are pleased to quote on furnishing the labor and material to design and fabricate the dry sand floor conveyors shown on our drawing E–1176–1."

". . . .

"By the customer:
"1. All erection.
"2. All foundation and anchor bolts furnished and set in accordance with our plans.
"3. All electric, pneumatic, and hydraulic controls."

Joe Brown, vice president in charge of engineering at Roberts Corporation, testified that he was in charge of the design and drawings for the conveyor. He was not qualified to design electrical controls. No one was designing electrical controls for Roberts Corporation in 1966. Occasionally Roberts did furnish controls in conveyors, at that time subcontracting the work. No controls were sent with this conveyor sold to the Beloit Corporation. The Roberts Corporation gave no instructions or advice to Beloit regarding safety features for the conveyor. He gave the following testimony:

"*Q.* Is it your answer that you did not have enough information about the way that they were going to use it that you were not able to suggest to Beloit Corporation what safety devices to incorporate?
"*A.* They did not want to buy any safety information from us, they bought only hardware.
"*Q.* How do you come to that conclusion that they didn't want to buy any safety information?

"*A.* Well, they didn't pay for any. They bought the equipment that is specifically spelled out in this quotation and in the purchase order."

Harold A. Miller, Chief Electrical Engineer for Roberts Corporation, worked for a competitor conveyor manufacturer in 1966 called Planet Corporation. He had been in the controls business since 1946 and the conveyor business since 1966, and had experience designing controls for conveyors. He testified that it was dangerous to have a situation in which one worker could press the control to start the conveyor while another worker was standing on the conveyor. In the conveyor industry, there are several safety devices to protect workers from such dangers, all of which existed in 1966. One safety feature would be to install the push button at a height so that the operator would have to bend over to press the button. The push buttons on the conveyor in this case were sixteen or eighteen inches off the floor. When the operator is at the controls, it is not possible at all times to see everyone who is on the conveyor. Second, an alarm system linked to a time delay would alert the person standing on the conveyor by means of a horn and a flashing light that the conveyor was about to start moving. Third, the best device would be remote "palm buttons." The testimony was that if two people were working on the conveyor, both of them would have to get off the machine to press the palm buttons. This would assure that they were off the conveyor. Fourth, a cable operated pull switch could be stretched along each side of the conveyor, enabling a worker to disable the conveyor in an emergency. However, there was testimony that a cable-operated shutoff would not have helped Mr. Shawver because he could not have reached the cable.

Mr. Miller also testified that the custom in the industry both in 1966 and at the time of trial was to furnish conveyors with or without controls, according to

what the customer requested. There was also testimony that as to controls, the manufacturer either furnished nothing or "all of it." "All of it" includes safety devices. He said that the contract terms between Roberts and Beloit Corporation meant there would be no electrical component of any type furnished with the conveyor.

Mr. Miller stated that Roberts Corporation could not have sent along a package of safety devices because factory conditions might differ. To design an effective safety system, it would be necessary to know the noise level, the lighting system and competing signals on other equipment in the factory. He said that too much custom work was involved to say that one set of controls would satisfy all conditions.

Professor Ralph Barnett, a professor of engineering at the Illinois Institute of Technology and a consulting engineer testified that in his opinion the conveyor was not designed in a safe manner because the control system that is used instantly starts the conveyor moving without a warning. He observed as many as five people working on the work platform when the conveyor was standing still.. Anyone who pushed the forward button must be sure that everyone is off the conveyor because it starts without any warning at all. No matter where the operator is standing, or where the controls are located, it is possible not to see someone who is working on the platform.

He testified that a delay time with a horn or light going on before the conveyor can actually move would allow the people working on the platform to know that the conveyor was about to start. Such a warning system is not a major undertaking for a designer. Professor Barnett demonstrated a model of a warning system at the trial. When the start button is hit, a light begins to flash and a horn sounds. The warning system is linked to the starting mechanism so that the conveyor would not be able to start until ten seconds had elapsed. All

of the parts for such a device were available in 1966 and would cost about $250. The conveyor cost about $84,000.

He also testified that controls and safety devices were distinct concepts, although a control can be made into a safety device. He was unaware of any custom in the industry that if a manufacturer does not supply controls, he does not supply safety devices either. He said that the controls would be hooked up to the safety device which he demonstrated, but that the safety devices were totally separate. In his opinion the conveyor was unreasonably dangerous at the time it was shipped because of the total lack of safety devices.

The conveyor was shipped unassembled and without controls or safety devices. It was assembled and installed at the Beloit Corporation. There was testimony that some additional steel pieces were attached to the frame at the Beloit Corporation. These steel pieces were not furnished by Roberts. However, Mr. Miller did testify that as far as he knew the conveyor was assembled and operated at the Beloit Corporation as the Roberts Corporation designed it.

There was evidence that the warning device demonstrated by Professor Barnett could not be used because it exceeded noise levels permitted by the Occupational Safety and Health Act standards. There was also testimony that it would distract and take attention from more dangerous operations, such as trucks moving molten metal which are equipped with warning bells.

QUESTION #1: WAS THERE CREDIBLE EVIDENCE IN THE RECORD TO SUPPORT THE JURY'S FINDING THAT THE CONVEYOR, WHEN IT LEFT THE HANDS OF THE MANUFACTURER, WAS NOT IN SUCH DEFECTIVE CONDITION AS TO BE UNREASONABLY DANGEROUS TO THE BUYER OR ITS EMPLOYEES?

In reviewing a judgment entered on a jury verdict, this court will view evidence in the light most favorable to the verdict, and affirm if there is any credible evidence on which the jury could have based its decision, particularly where the verdict has the approval of the trial court. *Toulon v. Nagle*, 67 Wis.2d 233, 242, 226 N.W.2d 480 (1975). The credibility of witnesses and the weight given to their testimony are matters left to the jury's judgment, and where more than one inference can be drawn from the evidence, this court must accept the inference drawn by the jury. *Valiga v. National Food Co.*, 58 Wis.2d 232, 244, 206 N.W.2d 377 (1973).

This case went to jury on both strict liability and negligence theories. This court adopted sec. 402A, Restatement, 2d *Torts* in *Dippel v. Sciano*, 37 Wis.2d 443, 459, 155 N.W.2d 55 (1967), which provides:

"Sec. 402A. *Special Liability Of Seller Of Product For Physical Harm To User Or Consumer.*

"(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

"(a) the seller is engaged in the business of selling such a product, and

"(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

"(2) The rule stated in subsection (1) applies although

"(a) the seller has exercised all possible care in the preparation and sale of his product, and

"(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller."

Strict liability does not make the manufacturer or seller an insurer nor does it impose absolute liability.

*Howes v. Deere & Co.*, 71 Wis.2d 268, 273, 238 N.W.2d 76 (1976). As we stated in *Dippel, supra* at 460:

". . . the plaintiff must prove (1) that the product was in defective condition when it left the possession or control of the seller, (2) that it was unreasonably dangerous to the user or consumer, (3) that the defect was a cause (a substantial factor) of the plaintiff's injuries or damages, (4) that the seller engaged in the business of selling such product, or, put negatively, that this is not an isolated or infrequent transaction not related to the principal business of the seller, and (5) that the product was one which the seller expected to and did reach the user or consumer without substantial change in the condition it was when he sold it."

As the Roberts Corporation conceded in its brief to this court there was general agreement that the method of activating the conveyor was unsafe. Witnesses for both parties agreed that safety devices which were available could have been incorporated into the conveyor. The controversy in this case centers on the question of who had the responsibility to provide the safety devices.

A majority of this court in *Greiten v. La Dow*, 70 Wis.2d 589, 600–01, 235 N.W.2d 677 (1975) pointed out that strict liability in tort focuses, not on the failure to exercise ordinary care, but on whether the seller has marketed a dangerously defective product.

The Illinois Appellate court, applying Wisconsin strict liability law in *Christopherson v. Hyster Co.*, 58 Ill. App. 3d 791, 809–10, 374 N.E.2d 858 (1978) made the following observations:

"It is a fundamental principle of strict tort liability that the duty to design and manufacture a reasonably safe product may not be delegated by the manufacturer to the dealer, purchaser, or user. (See *Rios v. Niagara Machine & Tool Works*, 59 Ill.2d 79, 319 N.E.2d 232, (1974), and cases cited therein.) Under section 402A

the entire focus is on the condition of the product when it left the manufacturer's hands. Implicit in this focus is the concept that the manufacturer's duty is nondelegable.

"While no Wisconsin cases have apparently addressed this issue directly, we believe this concept of nondelegability is necessarily applicable to Wisconsin's use of 402A. All members in the chain of distribution of a product may be liable under 402A. Thus, the Wisconsin Supreme Court has emphasized that '[t]he original seller has a duty to market a reasonably safe product, and this duty is breached each time the defective or dangerous product is sold.' *(Barter v. General Motors Corp.,* 70 Wis.2d 796, 804, 235 N.W.2d 523, 527 (1975). Hyster could not delegate its duty to produce a reasonably safe lift truck to Chilton, plaintiff's employer.

"Our belief that instructions on the nondelegability of Hyster's duty in this case were proper is reinforced by the recent decision of the United States Court of Appeals for the Seventh Circuit, applying Wisconsin law, in *De-Santis v. Parker Feeders, Inc.,* (7th Cir. 1976), 547 F.2d 357. In that case, the minor plaintiff was injured when he became trapped in the auger of a cattle feeder which had no safety cover. Relevant to the instant issue, the DeSantis court stated:

"That other parties may also have been negligent in regard to the DeSantis' cattle feeder in no way absolves Parker Feeders from the duties it had to those injured by its products when they were incorporated in such feeders." (547 F.2d 357, 364).

■

One who markets an unreasonably dangerous product is not entitled to expect that others will make it safe. *Rios v. Niagara Machine & Tool Works,* 59 Ill.2d 79, 319 N.E.2d 232, 236 (1974); *Finnegan v. Havir Mfg. Corp.,* 60 N.J. 413, 290 A.2d 286, 292 (1972). The policy grounding for such a view was well stated in *Bexiga v. Havir Mfg. Corp.,* 60 N.J. 402, 290 A.2d 281, 285 (1972):

"Where a manufacturer places into the channels of trade a finished product which can be put to use and

which should be provided with safety devices because without such it creates an unreasonable risk of harm, and where such safety devices can feasibly be installed by the manufacturer, the fact that he expects that someone else will install such devices should not immunize him. The public interest in assuring that safety devices are installed demands more from the manufacturer than to permit him to leave such a critical phase of his manufacturing process to the haphazard conduct of the ultimate purchaser. The only way to be certain that such devices will be installed on all machines—which clearly the public interest requires—is to place the duty on the manufacturer where it is feasible for him to do so."

We agree with the reasoning in *Bexiga.* The jury instructions followed this rule. Thus, evidence as to customs in the industry regarding the installation of safety devices would be irrelevant where there is a nondelegable duty to design and manufacture a reasonably safe product. We also find irrelevant Mr. Brown's testimony that Beloit did not pay for any safety information. What is relevant is that Beloit did not pay for or contract for the necessary control system and Roberts did not furnish one.

A requirement for strict liability under 402A is that the product not only be unreasonably dangerous but that the manufacturer expect it to reach the user without substantial change. 402A (1) (b).

In the instant case, the evidence showed that the conveyor as operated here was dangerous because it started without warning to workers performing tasks on the equipment. There was testimony that controls and safety devices are distinct concepts. However, it was evident that the devices suggested by Mr. Shawver's expert witness were intimately interrelated with the control system on the conveyor.

There was undisputed evidence that Roberts Corporation would design and furnish only the mechanical

portions of the conveyor. It was left to the Beloit Corporation to furnish the electrical systems to control the conveyor. The Roberts Corporation had no expectation that the conveyor would reach the user without substantial change, that change being the type of control system that the user would install.

The deposition of Mr. Miller gave the definition of "controls" as defined by the American Society of Mechanical Engineers as a system governing the starting, stopping, direction of motion, acceleration, speed, retardation and function of the moving member in a predetermined manner.

The vice president of Roberts, Mr. Joe B. Brown in his deposition also used the same definition of controls and after referring to a note on the drawing of the conveyor system said, "I . . . put this statement in here so that whoever furnishes the controls will not tear up this equipment the first time they run it. It was for the protection of the equipment that we sold them."

In *City of Franklin v. Badger Ford Truck Sales,* 58 Wis.2d 641, 649, 207 N.W.2d 866 (1973), this court held that where a defective component part is incorporated into something larger, causing injury, the maker and supplier of the defective component part is subject to strict liability. However, the court also stated: "Where the component part is subject to further processing or substantial change, or where the causing of injury is not directly attributable to defective construction of the component part, the result might be different." *Id.*

Here, it was explicitly agreed that the conveyor was subject to further processing. The conveyor, which was inoperable without a control system, was not in itself defective. The defect was in the control system which failed to give warning or to insure that workers were off the conveyor when it was activated. Moreover, there was evidence that it was not feasible or practical for the

manufacturer to include safety devices without relating them to the control system and the overall work environment.

There was credible evidence from which the jury could conclude that Roberts did not design or install an electrical control system necessary to make the conveyor system operable and functional. There was also evidence that safety devices must be tied to and integrated with a control system as well as the general work environment. Thus the jury could conclude as it did, that the part of the conveyor furnished by Roberts was not unreasonably dangerous when it left Roberts' hands.

For the same reasons, the duty to warn would not apply to Roberts Corporation under the facts of this case. The defect arose because of the nature and location of the controls on the conveyor. Roberts Corporation had no involvement in the design and location of the controls. The Beloit Corporation had its own engineering department, and incorporated products safety features in equipment in products it manufactured. Ordinarily there is no duty to warn members of a trade or profession about dangers generally known to that trade or profession. *Eyster v. Borg-Warner Corp.*, 131 Ga. App. 702, 206 S.E. 2d 668, 670 (1974). The duty to warn may extend to employees of an industrial purchaser of equipment, *Kozlowski v. John E. Smith's Sons Co.*, 87 Wis.2d 882, 900, 275 N.W.2d 915 (1979). But in this case, a warning by the Roberts Corporation to the effect of "Do not stand on conveyor while it is moving" would have been ineffectual, since the problem was caused by lack of notice to workers that the equipment was about to move.

There was credible evidence from which the jury could conclude that the conveyor was not unreasonably dangerous when it left the hands of Roberts Corporation.

QUESTION #2: WAS THERE CREDIBLE EVIDENCE IN THE RECORD TO SUPPORT THE JURY'S FINDING THAT THE ROBERTS CORPORATION WAS NOT NEGLIGENT IN DESIGNING, MANUFACTURING, OR ASSEMBLING THE CONVEYOR, FAILING TO GIVE A WARNING AS TO THE DANGER OF THE CONVEYOR, OR FAILING TO PROVIDE THE BUYER WITH ADEQUATE PLANS, SPECIFICATIONS, INSTRUCTIONS AND DIRECTIONS FOR THE SAFE INSTALLATION OF THE CONVEYOR?

In contrast to strict liability, where negligence is asserted, the plaintiff must prove what was done was foreseeably hazardous to someone. The duty is one of ordinary care. The failure to exercise ordinary care constitutes a breach of the duty; and if harm is caused by that breach of duty, liability results. *Greiten v. La Dow,* *supra,* 70 Wis.2d at 602.

While strict liability and negligence differ in their elements, the facts already recited in the case at bar provided credible evidence to support the jury's finding that the Roberts Corporation was not negligent.

QUESTION #3: DID THE TRIAL COURT ABUSE ITS DISCRETION IN REFUSING TO GRANT A NEW TRIAL?

During cross-examination of Mr. Shawver, counsel for the Roberts Corporation asked:

"Now, this was an industrial accident so I assume that these expenses have been paid under Workmen's Compensation; have they?"

Mr. Shawver's counsel objected. Outside the jury's presence, counsel for Mr. Shawver told the court:

"*Mr. Long:* Your Honor, I do not think the jury is entitled to know this. However, now that it has been brought out, I think the jury should be instructed that even though the payments have been made by the insurance company, the insurance company now, for whatever reason there is, are entitled to collect back their money. Because the implication now is that he's already collected from the insurance company, and now he's trying to collect again. I think that's completely improper. I'm not going to move for a mistrial, because you've got us at a disadvantage having to bring this case again for Mr. Shawver. But I think this is completely improper. We have objected to it, and we're going to ask eventually for an instruction. We'd like the jury instructed now to disregard this. But we'll also ask for the instruction that regardless of the mention of insurance, they are to decide the case as though, whether insurance companies are involved or not the same way as if they weren't involved; because I think this was improper."

When the jury returned the court gave the following instructions:

"*The Court:* Ladies and gentlemen of the jury, just before we recessed there was an objection made to a question interposed regarding the payment of Workmen's Compensation benefits to Mr. Shawver after the injury. And the Court will advise the jury that Wisconsin Workmen's Compensation benefits have been paid to Mr. Shawver, but you are also instructed that he must repay to the compensation benefit payor, in other words, the Workmen's Compensation carrier or insurer, whatever amounts he has received in benefits out of the award, if any, that he receives in this case. So you should make your award here irrespective of the fact that there were Workmen's Compensation benefits paid. And we'll proceed then at this time with the testimony. Mr. Shawver, will you retake the witness stand?"

Mr. Shawver got the instruction he requested, and thus any error was waived.

The second remark alleged to have been prejudicial was the statement by counsel for Roberts Corporation in closing argument as follows:

"I don't think that there is any justification in this case whatsoever with the material that was submitted to find the Roberts Corporation either negligent or that there was a defective condition, unreasonably dangerous; and I think those questions just must be answered 'No.' There's just no way, no way that that question can be answered 'Yes' in my opinion. I don't care, if you find him 1 percent—if you find him 1 percent, we lose. That's all there is to it. We say they were not negligent. If, if they were, and I don't concede they were—we aren't talking about what might have happened. We're talking about what did happen.
"*Mr. Long:* If the Court please, the statement of Mr. Rosenberg is improper, informing the jury to the effect of the finding.
"*Mr. Rosenberg:* I'm not informing them of that.
"*Mr. Postel:* Let him finish.
"*Mr. Long:* We object.
"*The Court:* Ladies and gentlemen, the Court is going to instruct you that you are not to concern yourselves in arriving at your answers as to what the outcome of this lawsuit will be; and for counsel to touch on that in argument is an impropriety, and you are instructed to disregard that argument. Go ahead, Mr. Rosenberg."

This court has consistently held that it is error to inform the jury of the effect of its verdict. *McGowan v. Story*, 70 Wis.2d 189, 196, 234 N.W.2d 325 (1975). However, Mr. Shawver's lawyer did not move for a mistrial before the jury verdict as required by *Chart v. General Motors Corp.*, 80 Wis.2d 91, 108, 258 N.W.2d 680 (1977). The rationale for requiring a timely motion

for a mistrial is to prevent counsel from gambling on a favorable jury verdict before seeking a new trial. *Id.*

*By the Court.*—Judgment affirmed.