Cynthia LADWIG, Plaintiff,

v.

ERMANCO INCORPORATED and Whiting Corporation, foreign corporations, Defendant and Third-Party Plaintiffs,

v.

B. R. WORTH COMPANY, INC., and Meer Electric Co., Third-Party Defendants.

No. 78–C–71.

United States District Court, E. D. Wisconsin.

Jan. 9, 1981.

Arlo McKinnon, Kersten & McKinnon, Milwaukee, Wis., for plaintiff.

Joseph D. McDevitt, Borgelt, Powell, Peterson & Frauen, Milwaukee, Wis., for Ermanco and Whiting.

Theodore C. Seraphim, Kondos & Seraphim, Milwaukee, Wis., for B. R. Worth.

James G. Doyle, Schellinger & Doyle, Milwaukee, Wis., for Meer Electric.

## DECISION AND ORDER

MYRON L. GORDON, District Judge.

This action is the result of an industrial accident at the Leeson Electric Corporation involving a Leeson employee, Cynthia Ladwig. While performing a work-related function, Ms. Ladwig caught her hair in the driveshaft of a conveyor line manufactured by Ermanco, Inc., a subsidiary of Whiting Corporation. Ms. Ladwig originally brought suit against Ermanco and Whiting (Ermanco); Ermanco then brought a third-party action for contribution against B. R. Worth Co., Inc. (Worth), and Meer Electric Co. (Meer).

A settlement agreement between Cynthia Ladwig and Ermanco was filed on August 22, 1980; the action by Cynthia Ladwig against Ermanco was dismissed on August 25, 1980. Ermanco continued to pursue its third-party action against Worth and Meer, and a trial to the court was conducted on October 6 and 7, 1980. The parties have submitted post-trial briefs. This opinion constitutes the court's findings of fact and conclusions of law pursuant to Rule 52, Federal Rules of Civil Procedure. For simplicity, the designation "third-party" will not be used; Ermanco will be described as the plaintiff and Worth and Meer as the defendants.

## I. BACKGROUND

There are no significant disputes over the facts surrounding the accident itself. Leeson Electric is a manufacturer of small electric motors. The motors are assembled by employees stationed at workbenches which are positioned along a conveyor belt. The carrying surface of the conveyor is approximately three feet above the floor. The conveyor is used to convey trays of parts to the workers and to convey completed motors to the inspection and testing areas at one end of the conveyor. Prior to the accident, when motors failed to pass inspection, they were placed on a wooden pallet and returned to the employees who had assembled them. The pallets were located beneath the conveyor. Each assembler was then required to lift the motor to be repaired from beneath the conveyor to the workbench and make the required adjustments. All of these procedures were established by Leeson.

Workers at the assembly stations were not able to control the conveyor themselves. The only on/off control button was positioned at the opposite end of the conveyor from the inspection area. This single control center was operated by an employee who doubled as the supply person for the assemblers. When an assembler required additional parts, he would audibly call this fact to the parts person, who would send the parts down the conveyor. The supply person's duties at times took him away from the control center. Thus the control center was not always continuously manned.

Ms. Ladwig was an assembler for Leeson. The accident in question occurred when she went beneath the conveyor to retrieve a motor that had been rejected by inspection and returned to her work station. While she was under the conveyor, her hair became entangled in the exposed driveshaft of the conveyor. Her hair, scalp, and flesh from the upper portion of her face were torn off. In addition, Ms. Ladwig suffered a broken thumb and lacerations of the hand.

As noted above, Ermanco settled with Ms. Ladwig. The settlement provides that Ermanco should make the following payments: 1) $250,000 to Ms. Ladwig's counsel for attorney's fees, 2) $21,285 to American Insurance Company to reimburse all workers' compensation payments made to Ms. Ladwig, 3) $167,410.96 in a lump sum payment to Ms. Ladwig, and 4) monthly payments of $1,694.00 to Ms. Ladwig for the rest of her life, secured through the purchase of a paid-up contract with a life insurance company, and guaranteed for twenty years whether or not Ms. Ladwig dies earlier. The total cost to Ermanco of the settlement was $657,118.96. Ermanco now seeks contribution from Meer and Worth, pursuant to Wis.Stat. § 802.07(6).

## II. DISCUSSION OF LIABILITY

In a previous order dated October 21, 1980, I concluded that under Wisconsin law the negligence of all potential tortfeasors must be considered in the decision in this case. E. g. *Payne v. Bilco*, 54 Wis.2d 424, 195 N.W.2d 641 (1972); *see Heldt v. Nicholson Manufacturing Co.*, 72 Wis.2d 110, 115–119, 240 N.W.2d 154 (1975). I further ruled that this meant that the possible negligence of Leeson and Ms. Ladwig had to be considered, as well as that of Ermanco, Worth, and Meer.

■ Under Wisconsin law, the test of causation is "whether the defendant's negligence was a substantial factor in contributing to the result. It need not be the sole factor, the primary factor, only a 'substantial factor.'" *Schnabl v. Ford Motor Co.*, 54 Wis.2d 345, 353–54, 195 N.W.2d 602, 198 N.W.2d 161 (1972), citing *Kinsman v. Panek*, 40 Wis.2d 408, 417, 162 N.W.2d 27 (1968). A corollary to the substantial factor rule of causation is that "there may be several factors contributing to the same result." *Sampson v. Laskin*, 66 Wis.2d 318, 326, 224 N.W.2d 594 (1975), citing *Schnabl, supra.*

### A. LEESON

■ There is little dispute that Leeson was negligent and that its negligence was a substantial factor in this accident. Leeson is clearly responsible for its work policy requiring employees to be under the conveyor belt. This policy of regularly placing employees in close proximity to the conveyor's exposed driveshaft was unquestionably negligent. In addition, Leeson personnel were present and played a supervisory role in the installation of the conveyor. Thus Leeson was or should have been aware from a very early date of the danger surrounding this conveyor. Leeson's negligence was certainly a substantial factor in this accident.

### B. CYNTHIA LADWIG

■ I do not find any negligence on the part of Cynthia Ladwig. Under Wisconsin law, the standard applicable to a workingman has been described as follows:

"It is a lesser duty than a nonworkman under the same hazards. The workman's duty of care is usually stated as the care of an 'ordinarily intelligent and prudent workman to carry on his work so as to guard against injury to himself.' This is the language found in the Wisconsin cases for over forty-five years and includes the doctrine that momentary diversion of attention or preoccupation of a workman in the discharge of his duties minimizes the degree of care required of him in the absence of such diversion or preoccupation." *Knutter v. Bakalarski*, 52 Wis.2d 751, 755, 191 N.W.2d 235 (1971), *see Criswell v. Seaman Body Corp.*, 233 Wis. 606, 622, 290 N.W.2d 177 (1940).

This standard of care is incorporated in Wisconsin Jury Instruction—Civil 1051; this instruction is to be used when there is evidence that the worker was "absorbed and preoccupied with the work at hand." *Bourassa v. Gateway Erectors, Inc.*, 54 Wis.2d 176, 182–83, 194 N.W.2d 602 (1972). If the issue of Ms. Ladwig's negligence had been put to a jury, this instruction would certainly have been appropriate. Ms. Ladwig was performing a job duty which required her to stoop below, or crawl under, the conveyor belt to retrieve an electric motor. In so doing, she came too close to the exposed driveshaft of the conveyor and was caught in it. The evidence in the record supports the conclusion that she was

preoccupied with her job duty and therefore is held to a minimal standard of care. Applying that standard to the evidence, I am persuaded that there was no negligence on the part of Ms. Ladwig.

## C. ERMANCO

The plaintiff Ermanco manufactured the conveyor belt which caused the injuries to Ms. Ladwig. This conveyor, marketed under the trade name "XenoROL," is a live roller conveyor that uses an innovative new system to transfer power to the conveyor's carrying rollers. Conventional conveyors transmit torque to all the rollers by means of a single belt. Thus the carrying rollers spin together and can cause injury if a hand or other object slips between the carrying rollers. The XenoROL conveyor uses a common driveshaft below the carrying rollers, but it connects the carrying rollers to the driveshaft by means of individual elastromeric drive belts. Thus each individual carrying roller spins independently of the others and receives adequate torque to be driven, but not so much that injury can be caused. The design has the added benefit of quietness.

The problem with this conveyor is the location of the main driveshaft. The driveshaft on the model at Leeson runs the length of the conveyor at a level approximately six inches below the top of the carrying surface. When viewed from the side, all of the driveshaft is clearly visible and extends approximately two inches below the frame which supports the carrying rollers. The driveshaft is not centered below the carrying rollers; it is much closer to one side of the conveyor than the other. The driveshaft is one inch in diameter; the overflanges which connect the elastromeric belts to the carrying rollers are an inch and a quarter in diameter. Thus the XenoROL conveyor is designed with a completely exposed driveshaft operating at high speeds below the carrying surface of the conveyor.

The standard of liability placed upon a manufacturer when its product causes physical harm to a user is contained in Section 402A, Restatement of Torts 2d.

"402A. Special Liability of Seller of Products for Physical Harm to User or Consumer.

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) The seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller."

Ermanco argues that the case of *Shawver v. Roberts Corp.*, 90 Wis.2d 672, 280 N.W.2d 226 (1979), stands for the proposition that Ermanco as a matter of law cannot be held strictly liable. I find Ermanco's reliance misplaced. In *Shawver*, the Wisconsin supreme court found that the second requirement for strict liability, (1)(b) in Section 402A, had not been met. *Shawver* involved a worker who was injured when the conveyor on which he was standing started without warning. The conveyor was found to be unsafe because it would instantly start without warning. The conveyor had been sold unassembled and without any control system; the control system was purchased elsewhere. The Wisconsin supreme court found that the conveyor itself was not defective, because it was inoperable without the control system, which had not been supplied by the conveyor's manufacturer.

■ *Shawver* is distinguishable from the case at bar because the issue here is the location of and protection around the driveshaft of the XenoROL conveyor. The XenoROL conveyor was designed and manufactured by Ermanco. No changes in the driveshaft or in the actual conveyor were made by anyone. It is true that a control

system and a power system were added to the conveyor after it was delivered to Leeson, but those additions had nothing to do with the position and protection of the driveshaft. Ermanco designed the Xeno-ROL conveyor with the driveshaft in that position, and the conveyor was installed without substantial change in that condition. Thus both conditions for strict liability are met here.

Ermanco also argues that this conveyor is in compliance with the applicable industrial safety codes and thus is not defective in design. The American Society of Mechanical Engineers has issued several industry safety codes for conveyor belts and related equipment. Ermanco contends that under one such code, ANSI B20.1—1972, § 5.14.1.3, this type of conveyor can be guarded from accidental contact by a mechanical guard, i. e. an enclosure of some sort, or by position or location. The latter means that the conveyor is placed in such a location that it is remote "from foreseeable, regular, or frequent presence of public or employed personnel." ANSI B20.1—1972, § 5.14.1.4. Ermanco contends that since this conveyor could be adequately guarded by position, the code is satisfied.

■ It is true that the XenoROL conveyor could be installed in such a way that it would be guarded by position, but Ermanco's contention is nevertheless not impressive. If the conveyor is not installed in that manner, someone could readily come into contact with the driveshaft. When accidental contact is foreseeable, the code requires mechanical guards. ANSI B20.1—1972, § 5.14.1.3. Accidental contact is certainly foreseeable whenever the XenoROL conveyor is not guarded by position. The fact that this particular accident was the result of a work practice that was not foreseeable to Ermanco does not alter Ermanco's duty to design properly its conveyor in order to guard against accidental contact.

■ Ermanco argues that under ANSI B20.1—1972 safety is the responsibility of the purchaser when as here, the application of the product is not approved by the manufacturer. This language does not appear in the same passages of ANSI B20.1—1976,

which revised ANSI B20.1—1972. Further, a manufacturer who markets an unreasonably dangerous product cannot rely on others to make it safe.

"Where a manufacturer places into the channels of trade a finished product which can be put to use and which should be provided with safety devices because without such it creates an unreasonable risk of harm, and where such devices can feasibly be installed by the manufacturer, the fact that he expects that someone else will install such devices should not immunize him. The public interest in assuring that safety devices are installed demands more from the manufacturer than to permit him to leave such a critical phase of his manufacturing process to the haphazard conduct of the ultimate purchaser. The only way to be certain that such devices will be installed on all machines—which clearly the public interest requires—is to place the duty on the manufacturer where it is feasible for him to do so." *Shawver, supra,* at pp. 683–84, 280 N.W.2d 226, quoting *Bexiga v. Havir Manufacturing Corp.,* 60 N.J. 402, 290 A.2d 281, 285 (1972).

Applying these principles to the situation at bar, I find that the XenoROL conveyor was unreasonably dangerous as designed and that Ermanco is liable under a theory of strict liability.

I also find that Ermanco was negligent in two areas and that that negligence was a substantial factor in this accident. The first area involves the issue of appropriate instructions and warnings to accompany the XenoROL conveyor. *See* W. Prosser, *The Law of Torts,* § 96, pp. 646–47 (4th Ed. 1971).

■ The XenoROL conveyor as designed only met industry safety standards if it was placed in a remote position. Otherwise, mechanical guards were necessary and had to be added to the conveyor. This was a fact that Ermanco knew or should have known. No warnings of this situation were ever issued by Ermanco. Ermanco also never supplied any instructions on the proper installation of the XenoROL conveyor, even

though its own expert testified at trial that the installation of this conveyor should be supervised by material handling engineers. Ermanco also did not supply any warning labels to be affixed to the XenoROL conveyor.

These omissions violated Ermanco's duty to give adequate warnings. I find their absence to be a substantial factor in the cause of this accident.

The second area of Ermanco's negligence relates to the fact that two other scalpings involving the XenoROL conveyor had occurred prior to the Ladwig accident. One occurred in 1974 and one in 1975. The Ladwig accident occurred on October 5, 1977. Ermanco had notice of these accidents well before the Ladwig accident. Substantial evidence regarding these two accidents is in the record, and the similarities between these two accidents and the Ladwig accident are far more numerous than any differences.

Ermanco never sent any warnings about these two accidents to the purchasers of the XenoROL conveyor, including Leeson. In fact, no notices were sent to anyone, including Ermanco representatives. Ermanco did not notify anyone despite the statement of Ermanco's expert witness that once Ermanco knew of these accidents further occurrences of scalping were certainly foreseeable. Deposition testimony in evidence indicates that Ermanco did not issue such warnings because it could not decide on the proper approach; it was concerned over the application of product liability laws, and it believed that the problem was really that of the users, not Ermanco.

Ermanco has consistently contended that it was reasonable for Ermanco to assume that no one would establish a work policy that required employees to be in such proximity to the conveyor's driveshaft. Nevertheless, once Ermanco knew of the other accidents, it was not reasonable for Ermanco to assume that no problems existed. Further accidents should have been anticipated. The failure to issue warnings about the other scalpings violated Ermanco's duty to warn purchasers of unreasonable dangers surrounding the product. I find Ermanco's

failure to issue such warnings to be a substantial factor in causing this accident.

D. MEER

Meer was the electrical contractor who performed the installation work on the conveyor at Leeson. Meer has been associated with the Leeson facility from the time it was built; Meer employees performed electrical services at the Leeson site on a regularly scheduled basis. Leeson contracted the installation of the XenoROL conveyor to Meer. This was the second conveyor installed at the plant; Meer had also installed the first one.

Testimony at trial revealed that Daniel Doerr, Leeson's vice president in charge of manufacturing, worked with the Meer people on the installation. His instructions were essentially that the second conveyor was to be installed in the same way as the first one. He testified that he did not really supervise the installation, but he did determine that the conveyor operated correctly.

The Meer employee in charge of the installation was Leroy DePies. He testified that he did not really "design" the conveyor system as such; he merely set it up where he was told to and then did the necessary wiring. Mr. DePies is not a licensed electrician, but a journeyman wireman with twenty-six years of experience. This was his first installation of a power conveyor. He testified that he followed the national electrical code when he installed this conveyor.

To the extent that the testimony is contradictory, I find that Meer had the primary responsibility for the proper installation of the conveyor. It was stipulated that:

"Meer's electricians established the connection with the outside power source, installed wiring through the length of the conveyor, set up conduits and an outlet for each work bench along the conveyor. In addition, Meer electricians provided and installed the control for stopping and starting the conveyor which at the time of the accident was one stop/start button which was placed at the end of the conveyor. . . ." Agreed Statement of Facts, Pretrial Report.

I find the supervision provided by Leeson to have been minimal.

■ I believe that ordinary care is the appropriate standard to apply in evaluating the liability of Meer. I reject Ermanco's contention that Meer should be held to a theory of strict liability under sections 403 and 404, Restatement of Torts 2d. Those sections do not apply to the situation at bar, where the independent contractor installed the product without altering it in any significant way. The fact that Meer added the power source does not change this conclusion.

■ As discussed above, industry safety codes have been formulated for conveyors. The relevant portion of ANSI B20.1—1976, § 5.09.2.1 reads:

"Where necessary for the protection of employees from hazards, all exposed moving machinery parts that present a hazard to employees at their work station shall be mechanically or electrically guarded or guarded by location or position...."

I find that Meer violated this section when it installed the XenoROL conveyor with its unguarded driveshaft. Meer argues that only Ermanco should be responsible for the failure to guard because Ermanco first failed to guard the driveshaft mechanically. The code as written does not support that argument. This conveyor should have been guarded either mechanically *or* electrically. When Meer installed this conveyor, it was not guarded mechanically; Meer should then have guarded it electrically. Failure to do so violated this section of the industry safety code and was negligent.

I reject Meer's contention that there is no evidence in the record regarding electrical guarding. Mr. DePies' testimony coupled with the testimony of Ermanco's expert witnesses show this point with sufficient specificity that I am able to conclude that electrical guarding would have been appropriate to meet the standard of reasonable care.

ANSI B20.1—1976, § 5.11.2.3, is also relevant here. It provides:

"Remotely and automatically controlled conveyors, and conveyors where operator stations are not manned or are beyond voice and visual contact from drive areas, loading areas, transfer points, and other potentially hazardous locations on the conveyor path not guarded by location, position, or guards, shall be furnished with emergency stop buttons, pull cords, limit switches, or similar emergency stop devices.

"All such emergency stop devices shall be easily identifiable in the immediate vicinity of such locations unless guarded by location, position, or guards. Where the design, function, and operation of such conveyor clearly is not hazardous to personnel, an emergency stop device is not required.

"The emergency stop device shall act directly on the control of the conveyor concerned and shall not depend on the stopping of any other equipment. The emergency stop devices shall be installed so that they cannot be overridden from other locations."

Since the conveyor control center was not continuously manned, and the driveshaft was unguarded, Meer also violated this provision. None of the required electrical devices was installed. This was also negligence on the part of Meer.

Mr. DePies testified that he specifically attempted to comply with national and state electrical codes. Nonetheless, I find that Meer's work did violate one portion of the state's Administrative Code which dealt with electrical controls, IND 1.20(2), and one provision of the state's Electrical Code, E113.01(2).

Thus Meer's installation violated several provisions of applicable safety codes. I find these violations to constitute negligence, and I further find that this negligence was a substantial factor in causing this accident. For example, if there had been a stop/start button located at Ms. Ladwig's work station, she could have turned off the conveyor before she went beneath it. No such button was available; Meer's failure to install one as required was a substantial cause of this accident.

## E. WORTH

Worth is a distributor of material handling equipment for Ermanco and other manufacturers. It also distributes many other products; conveyors are a small part of its overall business. Its owner and sole shareholder is B. R. Worth. Worth has had a continuing relationship with Leeson; Mr. Worth testified that he made regular calls at the Leeson facility.

Mr. Worth has been involved in conveyor sales for several years. In the early 1960's, he was one of two owners of a conveyor manufacturing firm. He handled the sales end of that business. In his present business, he had sold two XenoROL conveyors prior to the sale to Leeson. He supervised the installation of one of those, but not the other.

When Leeson expressed dissatisfaction about their old conveyor to him, Mr. Worth had two or three meetings to discuss a replacement, specifically a XenoROL. Mr. Worth did not mention the Ermanco sales engineering department to Leeson during those meetings, even though he was aware that that department would assist in the installation of the conveyor if a request was made. His reason for this omission was that Ermanco would charge for this service if the job was not large enough, and he thought that the Leeson job might have been so small that Ermanco would impose a charge for its services.

█ Ermanco contends that Worth is strictly liable under Section 388, Restatement of Torts 2d. The crucial question here is whether Section 388(a) is satisfied; that subsection imposes liability where the supplier knows or has reason to know that the chattel "is likely to be dangerous for the use for which it is supplied." Mr. Worth has been in the conveyor business for many years and certainly is an experienced salesman. He was heavily involved in Leeson's decision to purchase this conveyor. He was frequently in the Leeson plant and knew of Leeson's intended use of this conveyor, although no one has contradicted his testimony that he did not know of the practice of putting motors under the conveyor. However, I find that Mr. Worth had reason to know of that use and thus that this conveyor as supplied was dangerous for its intended use. He failed to inform Leeson of this danger. Accordingly, Mr. Worth is liable under Section 388, Restatement.

## F. COMPARATIVE LIABILITY

█ Liability has been found against Leeson, Ermanco, Meer, and Worth. In the order of October 21, 1980, I held that it is necessary under Wisconsin law to apportion the negligence of all tortfeasors found liable. This is not altered by the fact that some of the tortfeasors were found liable under a theory of strict liability while others were found liable under a theory of negligence. When contribution is an issue, a percentage of the judgment must be allocated among all those liable. *See, e. g., City of Franklin v. Badger Ford Truck Sales*, 58 Wis.2d 641, 651–55, 207 N.W.2d 866 (1973).

I have weighed the various factors that resulted in liability for each of the parties and Leeson. I am impressed by the significant elements pertaining to Ermanco. Ermanco knew that installation should be supervised by properly trained personnel. Ermanco also knew that two previous scalpings had occurred. Thus Ermanco possessed a great deal of information about this product, but it did not convey any of it to Leeson, Meer, or Worth. Instead Ermanco left the others in the dark.

As for the others, Leeson's work rule was patently dangerous. Meer was an experienced electrical company aware of the various industry safety codes it had to follow. I have found the protestations of ignorance on the part of Mr. Worth to be insufficient to avoid liability.

█ When weighing all these factors together, I must place a major portion of the fault on Ermanco. It is certainly conceivable that all the others would have altered their conduct prior to this accident if Ermanco had simply provided them with all, or even some, of the information which Ermanco possessed.

Accordingly, I now allocate the percentages as follows: 1) I find Ermanco to be 55 percent at fault, 2) I find Leeson to be 35 percent at fault, 3) I find Meer to be 7 percent at fault, and 4) I find Worth to be 3 percent at fault.

## III. CONTRIBUTION

■ As noted above, Ermanco reached a settlement in thé amount of $657,118.96 with the original plaintiff in this action, Cynthia Ladwig. Ermanco now seeks contribution from Meer and Worth. Contribution is assessed in proportion to the percentage of causal negligence allocated to each tortfeasor. *Bielski v. Schulze*, 16 Wis.2d 1, 114 N.W.2d 105 (1962). The doctrine was explained in *Hartford Fire Insurance Co. v. Osborn Plumbing & Heating, Inc.*, 66 Wis.2d 454, 460, 225 N.W.2d 628 (1975).

"The doctrine of contribution rests on the principle that when parties stand in equal right the law requires equality, and one party should not be obliged to bear the whole of a common burden. The doctrine is founded on principles of equity and natural justice. The basic elements of contribution as applied to negligence cases are: 1. Both parties must be joint negligent wrongdoers; 2. they must have common liability because of such negligence to the same person; 3. one such party must have borne an unequal proportion of the common burden." (citations omitted).

■ There is no dispute that the *Hartford* requirements for contribution have been met in this case, but a problem remains. A finding of liability has been found against Leeson, Ms. Ladwig's employer. The Wisconsin supreme court has consistently held that a third party tortfeasor has no remedy for contribution against an employer, because Section 102.-03(2), Wis.Stat., "makes the payment of workers' compensation the employer's exclusive liability for work-related injuries." *Mulder v. Acme-Cleveland Corp.*, 95 Wis.2d 173, 177, 290 N.W.2d 276 (1980) (Heffernan), citing *A. O. Smith Corp. v. Associated Sales & Bag Co.*, 16 Wis.2d 145, 113 N.W.2d 562 (1966); *Wisconsin Power & Light Co. v. Dean*, 275 Wis. 236, 81 N.W.2d 486 (1957);

and *Buggs v. Wolff*, 201 Wis. 533, 230 N.W.2d 621 (1930). Thus Ermanco cannot recover contribution from Leeson, only from Worth and Meer.

The parties do not agree on the effect Leeson's immunity from contribution has on the allocation for contribution purposes. Ermanco contends that only the negligence of the parties should be considered. The defendants argue that the contribution question must be determined with regard to the negligence of Leeson.

The Wisconsin courts have not ruled on precisely this question, but *Mulder* did discuss the situation where an employer and one third party are found negligent. In *Mulder*, General Electric and the employer were each found negligent, but the trial court dismissed General Electric's demand for contribution against the employer. General Electric was thus liable for the full amount of the plaintiff's damages, less any amount attributable to the plaintiff. The *Mulder* court upheld this result.

The *Mulder* court freely acknowledged that injustices could result from this rule and pointed to *Schuldies v. Service Machine Co., Inc.*, 448 F.Supp. 1196 (E.D.Wis.1978), as an example. In *Schuldies*, the jury found the employer 70 percent negligent, the employee 5 percent negligent, and the third party 25 percent negligent. Judge Warren rejected the third party's contention that it should only pay 25 percent of the damage award because it was only 25 percent negligent. Thus the third party was required to pay 95 percent of the damage award even though it was only 25 percent negligent.

The defendants in the case at bar argue that Wisconsin law does not agree with *Schuldies*. The cases they cite do not deal with the issue of contribution, however. Instead, they stand for the proposition already discussed in my order of October 21, 1980, that when allocating negligence, all possible tortfeasors must be considered. This process has been accomplished. On the issue of contribution, however, *Mulder* must stand as the definitive statement of Wisconsin law.

The defendants also cannot find solace in the case of *Soeldner v. White Metal Rolling & Stamping Corp.*, 473 F.Supp. 753 (E.D. Wis.1979). In *Soeldner,* the plaintiff was an injured worker who sued a third party for negligence. The jury found the plaintiff's employer 60 percent negligent, the plaintiff 32 percent negligent, and the third party 8 percent negligent. After examining the dicta in *May v. Skelly Oil Co.*, 83 Wis.2d 30, 38–39, 264 N.W.2d 574 (1978) (Abrahamson), I concluded that the third party should only pay that portion of the damage award which represented his percentage share of negligence. I did not require the third party to be responsible for the negligence of the employer; that negligence was to be borne by the plaintiff, since as between the plaintiff and the third party the plaintiff was the more negligent.

I believe that the *Soeldner* decision was a correct interpretation of Wisconsin law as it appeared to be at that time. However, the crucial underpinning of *Soeldner* was *May,* and the reasoning of *May* was rejected in *Reiter v. Dyken*, 95 Wis.2d 461, 472–75, 290 N.W.2d 510 (1980) (Beilfuss). The demise of *May* must by necessity take *Soeldner* with it; *Soeldner* is no longer a correct interpretation of Wisconsin law. Even if *Soeldner* was still viable, it would not apply in the case at bar, for there was no finding of negligence on the part of Cynthia Ladwig. Thus her negligence was not greater than that of any third party.

In the case at bar, there are multiple third parties, and one seeks contribution from the others. Under *Schuldies* and *Mulder,* a third party must absorb the negligence percentage of the employer. No logical reason is evident why there should be a different rule when there are several third parties instead of one. The defendants' position is essentially that they should only pay their precise percentage share. Thus Meer would pay 7 percent of the award and Worth 3 percent, leaving Ermanco with the remaining 90 percent. This result does not satisfy the basic principle of contribution that "one party should not be obliged to bear the whole of a common burden." *Hartford,* supra, at p. 460, 225 N.W.2d 628. The fact of Leeson's liability (but exculpa-

tion from contribution) must be treated as a common burden. The defendants have presented no justification for placing that burden solely on Ermanco, and none is apparent to the court.

 Thus the settlement amount should be divided among the three parties according to their relative percentage share of negligence. Thus Ermanco must bear $^{55}\!/_{65}$ths, Meer $^{7}\!/_{65}$ths, and Worth $^{3}\!/_{65}$ths. Applying the above percentages to the settlement amount of $657,118.96, I find that Ermanco should recover from Meer the sum of $70,766.66; Ermanco should recover from Worth the sum of $30,328.57.

Therefore, IT IS ORDERED that Ermanco recover from the defendant Meer Electric Co. the sum of $70,766.66 and from the defendant B. R. Worth Co., Inc. the sum of $30,328.57.