TIM TORRES ENTERPRISES, INC., a Wisconsin corporation, Plaintiff-Respondent,

v.

Robert J. LINSCOTT, Linscott Inc., a/k/a Gilles Frozen Custard, Inc., Defendants-Appellants.†

Court of Appeals

*No. 86–1702. Submitted on briefs July 7, 1987.—Decided October 21, 1987.*

(Also reported in 416 N.W.2d 670.)

† Petition to review denied.

58

For the plaintiff-respondent the cause was submitted on the briefs of *William H. Vettel,* of Milwaukee.

For the defendants-appellants, the cause was submitted on the briefs of *Michael, Best & Friedrich,* with *Michael E. Husmann* and *John E. Flanagan,* of counsel.

Before Moser, P.J., Wedemeyer and Sullivan, JJ.

WEDEMEYER, J. Robert J. Linscott and Linscott, Inc., a/k/a Gilles Frozen Custard, Inc., (Linscott) appeal from a judgment approving a jury verdict in favor of Tim Torres Enterprises, Inc. (Torres). The jury found that Linscott had made untruthful, deceptive or misleading statements in violation of sec. 100.18, Stats., and that these statements defamed Torres. As a result, the jury awarded Torres pecuniary, compensatory and punitive damages.

Linscott raises numerous issues of error. Only the following issues are dispositive of this appeal: (1) whether the evidence is sufficient to support findings that Linscott made untruthful statements contrary to

sec. 100.18, Stats., and that Torres suffered any loss as a result of these statements; (2) whether the admission of hearsay testimony was reversible error; and (3) whether a new trial is required because the jury verdict was inconsistent. Because there was sufficient credible evidence to support findings of untruthfulness and Torres' consequent loss, and to support the verdict despite the hearsay testimony, and because the verdict was consistent, we affirm.

To better understand the basis for this appeal, we will briefly review the generally undisputed facts. When it comes to frozen custard, the Paul Gilles Drive-In custard stand, located at the intersection of 76th Street and Bluemound Road in Wauwatosa, Wisconsin, has been a household name in the Milwaukee area for generations. Linscott began working for Paul Gilles in 1947, becoming his manager and eventually taking over the retail business in 1978. Torres began his association with Gilles in 1963. In 1972, after supervising the business' wholesale branch, Torres, by a licensing agreement with Gilles to use the Gilles Frozen Custard trademark and formula, took over the wholesale business and began producing and selling Gilles Frozen Custard from a separate location.

In 1978, when Linscott was considering acquiring the 76th Street retail business, he was aware of Torres' 1972 license agreement and its contents. At Linscott's request, a new agreement between Gilles and Torres was executed in 1978. Torres agreed not to sell Gilles Frozen Custard to customers who would resell it in a non-packaged form within a three-mile radius of the 76th Street business, with some exceptions. Linscott then acquired the retail business,

although he did not obtain all of the concessions that he had desired.

By these two contracts executed in 1978, both Torres and Linscott had separate licensing agreements with Gilles which allowed each the right to use the Gilles Frozen Custard trademark so long as the custard upon which they placed this trademark met minimum standards set forth in their agreements. Linscott acknowledged that when he bought the retail rights to sell Gilles Frozen Custard at the 76th Street custard stand he was aware that Torres had Gilles Frozen Custard wholesale rights.

In 1979, Torres started selling custard to the Chancery restaurant in Wauwatosa, Wisconsin. A sign was placed at the entry to the restaurant which advertised "Gilles hot fudge sundaes." When Linscott's customers asked him if he was selling custard at the Chancery, he sought legal advice to determine if the sign violated his agreement with Gilles. He called Gilles to object to the sign. The sign was taken down, but the reason for its removal is uncertain.

In September, 1982, Torres began selling custard to a Grand Avenue Mall dessert stand in downtown Milwaukee. A sign was posted stating that Gilles Frozen Custard was available. One of Linscott's customers, after observing the sign, asked him whether he was selling custard in the Grand Avenue Mall. Linscott again sought legal advice and complained to Gilles.

The contents and admissibility of a conversation at a New Year's Eve party in December, 1982, between Gilles and Linscott became highly contested. At trial, Torres was allowed to testify about his conversation with Gilles at that party. Torres stated that Gilles had related to him that "Linscott was very

unhappy with the whole situation and that I could expect something to happen."

During this time, Linscott, Gilles, and Torres met to discuss the matter.[1] At this meeting, all parties realized that inconsistencies existed between the separate agreements. Torres did not believe the sign in the Grand Avenue Mall violated any provision in his agreement. He refused to take the sign down and further refused to renegotiate any inconsistent terms in his contract.

In late January or February of 1983, Linscott placed a sign on his custard stand's marquee under the name Paul Gilles, which stated, "Only here can you buy genuine Gilles Frozen Custard." Torres complained to Gilles. Linscott claimed he had displayed the sign because he had received complaints from customers about the quality of the custard produced by Torres and sold in stores. The sign remained up for less than two days; the reasons for its removal are disputed.

In February 1983, Linscott placed a message on the menu board inside the custard stand which stated, "We do not sell 'our' Gilles Frozen Custard in any store."[2]

---

[1] It is unknown whether this meeting occurred before or after the New Year's Eve party.

[2] The sign was changed to state "We do not sell 'our' Gilles Frozen Custard made here in any store" after Torres objected. The jury was asked if the sign displayed on the menu board contained a statement which was untrue, deceptive or misleading and whether the sign displayed on the menu board was defamatory. It is not clear what statement the jury was evaluating. The court, after trial and at the end of the proceedings, stated that it did not think there was anything wrong with the changed statement and refused to restrain it.

The next incident occurred in April, 1984. The concession vendor for Milwaukee County Stadium purchased cups of custard from Torres which were sold out of portable coolers with signs which stated, "It's a hit! Gilles Famous frozen custard." When a customer informed Linscott of this, Linscott again conferred with his lawyer, who complained to Torres through Gilles' widow (Gilles had recently passed away). During this time, Linscott placed a second sign on his marquee for two days which stated, "Only here do we sell our 'Gilles' Frozen Custard." In September, 1984, for two or three days, Linscott displayed a third marquee sign which stated, "Only here do we sell our original Gilles Frozen Custard."

Additionally, in October 1984, Linscott had 10,000 fliers printed which stated, in part, "[T]here's only one place to buy that old-fashioned ... custard ... Our custard is the **original** ... available at our drive-in only and not sold in stores." (Boldface and last ellipsis in original.) After 500 of these fliers were distributed at the custard stand, Torres objected, and Linscott stopped circulating them.

On November 30, 1984, Torres commenced five causes of action against Linscott personally and against Linscott, Inc. The trial court submitted only two of the claims to the jury. In the first action, Torres alleged that all five advertised statements were untrue, deceptive or misleading, contrary to sec. 100.18, Stats. In the second action, Torres claimed that these five statements defamed him. He sought punitive damages in both claims.

The jury found that under sec. 100.18, Stats., all of the statements were untrue, deceptive or misleading, and awarded Torres $18,000 for pecuniary loss, and $35,000 for punitive damages. In the defamation

action, the jury found that all of the statements had defamed Torres but only the flier had been issued with express malice. The jury awarded Torres $10,000 for damages to his reputation and $10,000 in punitive damages, but did not award any pecuniary loss for the defamatory statements.

In response to motions after verdict, the trial court denied Linscott's request to change unfavorable answers in the verdict, his motion for judgment notwithstanding the verdict, and his motion for a new trial. The trial court did, however, strike the $10,000 punitive damage award granted in the defamation action because it arose out of the same facts involved in the first cause of action and was therefore included in the other $35,000 punitive damage award. Linscott now appeals.

## SUFFICIENCY OF THE EVIDENCE

Linscott contends that Torres failed to present sufficient credible evidence that any of the statements under examination were untruthful, deceptive or misleading, or that Torres suffered any loss as a result of the statements. We disagree.

Section 100.18, Stats., entitled "Fraudulent representations," is included in the statutory chapter regulating trade practices. Section 100.18(1), Stats., in relevant part, provides that no person or corporation, with intent to sell, distribute or increase the consumption of anything offered by it to the public, shall place before the public a statement which contains any assertion or statement of fact which is untrue, deceptive or misleading.

Section 100.18(1), Stats., provides protection from untruthful, deceptive *or* misleading advertising. Since

the statute lists three separate alternatives, the factfinder only has to determine that a statement is untrue to find a violation of the statute.[3] Because Linscott has not argued that the jury's scope of inquiry should have been limited to one of the statute's alternatives, we will limit our analysis to whether there was sufficient credible evidence for the jury to find that the statements were untrue.

Linscott analogizes sec. 100.18(1), Stats., to the Lanham Act sec. 43(a), 15 U.S.C. sec. 1125(a) (1982).[4] He cites caselaw interpreting it to claim that if an allegedly false or misleading statement is ambiguous or literally true, then evidence of the public's understanding must be produced in order to prove that the advertisement is deceptive.

Linscott further claims that Torres conceded at trial that the messages on the signs were literally true and that the issue at trial was whether the messages created a false impression or misled or deceived consumers of Torres' product. We can find no support in the record for Linscott's assertion that Torres

[3]"[A] statement is untrue which does not express things exactly as they are." *Zolintakis v. Equitable Life Assur. Soc. of the United States,* 108 F.2d 902, 905 (10th Cir.), *cert. denied,* 310 U.S. 640 (1940).

[4]15 U.S.C. sec. 1125(a) (1982) in relevant part provides:

Any person who shall ... use in connection with any goods or services ... a false designation or origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce ... shall be liable to a civil action ... by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

conceded that the signs were literally true. Whether the statements were true or false was an issue.

Case law interpreting sec. 43 of the Lanham Act provides that evidence of public understanding is not always required to find a violation of the law. When a statement is actually false, relief can be granted on the court's own findings without reference to the reaction of the product's buyers or consumers. *American Home Products Corp. v. Johnson & Johnson,* 577 F.2d 160, 165 (2d Cir. 1978). *See also Quaker State Oil Refining Corp. v. Burmah-Castrol, Inc.,* 504 F. Supp. 178, 182 (S.D.N.Y. 1980) (if advertising alleged to violate Lanham Act is false on its face, preliminary injunction may be granted without reference to survey data indicating consumers were actually misled).

We note that other federal law is applicable to interpreting sec. 100.18, Stats. *Cf. State v. Amoco Oil Co.,* 97 Wis. 2d 226, 238, 250, 293 N.W.2d 487, 493–94, 499 (1980) (sec. 100.18(2), Stats., is compatible with the objectives of sec. 5(a)(1) of the Federal Trade Commission Act, 15 U.S.C. sec 45(a)(1) and the Federal Trade Commission Guides.)

The Federal Trade Commission Act sec. 13(a), 15 U.S.C. sec. 53(a) (1982) gives the Federal Trade Commission the power to bring suit to enjoin the dissemination of any advertisement when it has reason to believe a person is disseminating a false advertisement which is likely to induce a purchase of food, drugs, devices or cosmetics. To implement "the prophylactic purpose of the statute" it is not necessary to show that the misleading or deceptive statement was relied upon for there to be a violation of the law. *Federal Trade Commission v. Sterling Drug, Inc.,* 317 F.2d 669, 674 (2d Cir. 1963). It is enough to show that

the "representations made have a capacity or tendency to deceive, i.e., when there is a likelihood or fair probability that the reader will be misled." To find a violation of the statute the "cardinal factor is the probable effect which the advertiser's handiwork will have upon the eye and mind of the reader." *Id.*

██ The ability to determine truth or falsity is within an individual's ordinary experience requiring no special learning, study or evidence. *Cf. Donaldson v. Read Magazine, Inc.,* 333 U.S. 178, 189 (1948). ("Questions of fraud may be determined in the light of the effect advertisements would most probably produce on ordinary minds.") It is well within the jury's competence to determine whether a statement is true or false. Having concluded that a determination of untruthfulness does not require proof of public reaction, we must review the record to determine whether there was sufficient credible evidence to sustain a finding of untruthfulness.

██ In reviewing a judgment based on a jury verdict, we will view the evidence in the light most favorable to the verdict and must affirm it if there is any credible evidence upon which the jury could have based its decision, particularly where the verdict has the approval of the trial court. Sec. 805.14(1), Stats.; *Shawver v. Roberts Corp.,* 90 Wis. 2d 672, 681, 280 N.W.2d 226, 230 (1979). Weighing testimony and evaluating credibility of witnesses are matters for the jury. We must accept the inferences drawn by the jury where more than one inference can be drawn from the evidence. *Shawver,* 90 Wis. 2d at 681, 280 N.W.2d at 230.

The jury had before it the following listed items of evidence:

(1) the 1972 agreement between Torres and Gilles granting Torres the exclusive right to produce, sell and market to wholesale frozen custard buyers under the name and style of Gilles Frozen Custard;

(2) Linscott's 1978 agreement with Gilles granting Linscott a license to use the trademark Gilles Frozen Custard in retail trade only, which agreement acknowledged Torres' wholesale rights to the trademark and further provided for minimum quality standards obliging Gilles to ensure that Torres complied with the same quality standards;

(3) Torres' 1978 agreement with Gilles reaffirming Torres' exclusive wholesale rights to produce and sell Gilles Frozen Custard in accord with certain minimum quality standards, but granting some territorial concessions to accommodate Linscott;

(4) the sign Linscott placed on his custard stand marquee stating "Only Here Can You Buy Genuine Gilles Frozen Custard;"

(5) the sign Linscott place on his marquee stating, "Only Here Do We Sell Our Gilles Frozen Custard;"

(6) the sign Linscott placed on his marquee stating, "Only Here Do We Sell Our Original Gilles Frozen Custard;"

(7) the sign Linscott placed on his menu board inside his custard stand and

(8) a copy of the flier Linscott distributed stating, "there's only one place to buy that old-fashioned ... custard ... Our custard is the **original** ...

68

available at our drive-in only and not sold in stores." (Boldface and last ellipsis in original.)

In addition, the jury heard Linscott acknowledge that he was aware of Torres' right to use the Gilles trademark in his wholesale business. Also, Linscott did not dispute Torres' trademark rights at the time he put up the signs relating to the genuineness and originality of his custard product. Furthermore, Linscott admitted that in 1978 he (Linscott) had changed the recipe for making his custard.

The jury also heard Linscott claim that he was only trying to protect his product from complaints lodged with him about Torres' custard. He argued that his advertising was only intended to differentiate his product from Torres' and that it was a matter of self-preservation.

After weighing the evidence before it, the jury could have accepted Linscott's reasons for his advertising. Based on the evidence, the jury could also find that his advertising was untrue because it meant that he was the only one who could claim to be producing and selling Gilles Frozen Custard, regardless of the quality of the custard or the point of consumption. After reviewing the various agreements, the advertisements, the timing of the appearance of the advertisements, and Linscott's admissions, we conclude as a matter of law that there was sufficient credible evidence upon which the jury could find that the statements were untrue.

Linscott next contends that the evidence is insufficient to prove that the advertising caused Torres' damages. We disagree.

Section 100.18(11)(b)2, Stats., states that "[a]ny person suffering pecuniary loss because of a violation of this section by any other person may sue in any court of competent jurisdiction and shall recover such pecuniary loss." We interpret this section as requiring a causal connection between the practices found illegal and the pecuniary losses suffered. *Cf.* Jeffries, *Protection for Consumers Against Unfair and Deceptive Business*, 57 Marq. L. Rev. 559, 602 n. 283 (1974) (sec. 100.18[11][d][1971] requires causal connection between practices found illegal in the injunction litigation and pecuniary losses suffered). We interpret sec. 100.18(11)(b)2 as requiring some proof beyond the content of the advertisement itself to establish that the plaintiff was in fact damaged by it. *See Olsonite Corp. v. Bemis Manufacturing Co.,* 610 F. Supp. 1011, 1026 (E.D. Wis. 1985).

The trial court instructed the jury that "there must be some actual consumer reliance on the signs before awarding pecuniary damages." There is evidence in the record that the public questioned the signs and the quality and content of Torres' product. Torres testified that after each sign he received customer reaction questioning the quality of his product, including people calling his product a fake and a fraud because of the advertising. He also testified that his sales were only down in the area around the drive-in. We conclude that there was sufficient evidence for the jury to find that the false advertising caused Torres' loss.

Linscott next contends that Torres failed to present sufficient credible evidence that he suffered a loss of $18,000 as a result of the false statements. Although acknowledging that damages need not be

proven with mathematical certainty, Linscott asserts that damages must be proven with reasonable certainty, and that damages must be certain in respect to the cause from which they proceed.

"If there is any credible evidence which under any reasonable view supports the jury finding as to the amount of damages, especially where the verdict has the approval of the trial court, this court will not disturb the finding unless the award shocks the judicial conscience." *Ford Motor Co. v. Lyons,* 137 Wis. 2d 397, 446, 405 N.W.2d 354, 374 (Ct. App. 1987).

Torres testified that he expected a five percent increase in sales within approximately three miles of the 76th Street business, based upon his experience and his product's sales history. He testified as to his actual sales in the three-mile area during the years 1984 and 1985. He calculated his damages based upon the difference between his projected and actual sales in that area over that period. He determined his total loss of profit for the two years was $28,031.

To prove his pecuniary damages from projected lost profits as the result of the advertisements, Torres called an expert witness, Dr. Lacziniak, a Marquette University professor of marketing. Lacziniak testified that, in his opinion based upon a reasonable degree of marketing probability, Torres' loss of profits from Linscott's negative advertising was somewhere in a range from zero (including a gain of $9,144) to $54,228. Linscott offered no rebutting expert testimony.

Lacziniak's opinion was based on the marketing theory of autoregressive integrated moving average (ARIMA), a form of regressive analysis.[5] Regressive

---

[5]Regressive analysis is a statistical method that permits analysis of a group of variables simultaneously. The method

analysis is used "to estimate the extent of the independent effect ... variables have on a dependent variable such as profit." Harrison, *The Lost Profits Measure of Damages in Price Enhancement Cases,* 64 Minn. L. Rev. 751, 782 (1980). The technique of regressive analysis is not new to judicial proceedings and has found frequent application in cases concerning sex and race discrimination, antitrust violations, census undercounts, and voter registration. *See* Finkelstein, *The Judicial Reception of Multiple Regression Studies in Race and Sex Discrimination Cases,* 80 Colum. L. Rev. 737 (1980).

The general purpose of sec. 100.18, Stats., is to prevent certain activities deemed harmful to citizens' economic and social well-being. Even though the damages from these illegal activities may not be easy to quantify and prove, this does not mean that there should be no recovery. The broad remedial scope of sec. 100.18 and its protective purpose make it similar to the remedial provisions of the federal antitrust laws in that to eliminate or rectify a wrong the traditional standards of proof may be relaxed if necessary.

*Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 123 (1969) addressed the burden of proof problem in a damage action for injuries from a partial or total exclusion from a market. The United States Supreme Court noted that the damage issues in these cases are "rarely susceptible of the kind of concrete, detailed proof of injury which is available in other contexts." Citing with approval to *Bigelow v. RKO Radio Pictures, Inc.,* 327 U.S. 251, 264–65 (1946), the court declared:

---

attempts to isolate the effects of various factors on a phenomenon, and analyze their relationships.

Although the factfinder is not entitled to base a judgment on speculation or guesswork, "the jury may make a just and reasonable estimate of the damage based on relevant data, and render its verdict accordingly. In such circumstances, 'juries are allowed to act upon probable and inferential as well as direct and positive proof.' Any other rule would enable the wrongdoer to profit by his wrongdoing at the expense of his victim. It would be an inducement to make wrongdoing so effective and complete in every case as to preclude any recovery, by rendering the measure of damages uncertain. Failure to apply it would mean that the more grievous the wrong done, the less likelihood there would be of a recovery."

*Zenith Radio Corp.* at 124 (citations omitted).

Our supreme court, in *Novo Industrial Corp. v. Nissen,* 30 Wis. 2d 123, 133, 140 N.W.2d 280, 285 (1966) approved a relaxation of the traditional rules for proving damages when, in response to an alleged insufficiency of evidence challenge, it declared, "in its evaluation of damages the trial court undoubtedly acted in accordance with the well-established rule that by having caused the uncertainty of proof, the contract breacher is precluded from demanding a more precise measure of damages."

In explaining the basis for his opinion during direct and cross examination, Lacziniak made the following assumptions:

(1) The primary influence of Linscott's negative advertising would be felt by retailers located within a 3 mile radius of the Gilles drive-in and who also carry the custard product at retail.

(2) The profit margin on each gallon of Torres produced Gilles Frozen Custard is $2.10 per gallon to Torres.

(3) The primary influence of the Linscott advertising would be felt in 1984 and 1985 after which time its effects would be minimal.

(4) Torres and his competitor did not fundamentally change the business strategies which they used to deal with retail customers during 1984 and 1985.

After reviewing Torres' yearly increases in sales from 1981 to 1983, Lacziniak forecast sales for 1984 and 1985. He noted that, contrary to reasonable expectations, there was a decrease in the anticipated sales for those years. Since Linscott's negative advertising appeared in 1983 or 1984, and assuming that there were no other major negative influences on sales, the negative advertising had a strong influence on profits. Lacziniak then compared actual sales to his estimate of potential sales to determine lost profits.

Lacziniak's analysis was not precise, providing a range from a possible $9,144 in increased profits to $54,228 in losses. Linscott subjected Lacziniak to vigorous cross-examination, challenged his assumptions, and tried to stress other factors. Linscott pointed to a ten percent price increase during the subject years and to Torres' promotion of Haagen Dazs ice cream in 1984. But evidentiary support exists in the record to refute these factors. It is for the jury to weigh the various factors. The bases for Lacziniak's opinion were not invalidated and the award based on his opinion does not shock the judicial conscience. We must leave the resolution of any conflicting inferences

to the jury. We conclude that there is sufficient credible evidence for the jury to find a pecuniary loss of $18,000 which was caused by Linscott's statements.

## HEARSAY EVIDENCE

Linscott next contends that the trial court erred in admitting hearsay testimony of Gilles about his [Linscott's] reaction to a sign advertising Gilles Frozen Custard at Grand Avenue Mall. The admissibility of evidence is addressed to the trial court's discretion. The trial court misuses its discretionary power when it grounds its decision upon an erroneous view of the law. *State v. City of La Crosse,* 120 Wis. 2d 263, 268, 354 N.W.2d 738, 740 (Ct. App. 1984).

The relevant portion of the testimony is as follows:

[Plaintiff's attorney]:

Q. Did you meet Paul Gilles at or around the holidays?

[Torres]

A. Yes, I did.

Q. And under what circumstances?

A. It was a holiday party out in Waukesha.

Q. And about what time was that?

A. Right around New Year's.

Q. And did you have occasion to discuss the sign and Grand Avenue with Mr. Gilles at that time?

A. Yes, I did.

Q. What was your discussion with Mr. Gilles?

A. *That Bob Linscott was very unhappy with the whole situation and that I could expect something to happen.* [Emphasis added.]

Q. When did Mr. Gilles relate that to you?

A. At this party.

Q. How long a time between that relation—that statement was made to you by Mr. Gilles was it 'til you observed that sign?

A. I believe Mr. Gilles left for Florida the following week, and that sign went up pretty soon thereafter.

Q. What did you do when you saw that sign?
[Defense Attorney]: Your Honor, I move to strike the testimony. It's not testimony what Bob Linscott said. He's testifying as to what Paul Gilles said Mr. Linscott's state of mind was.
THE COURT: Foundation isn't there yet. He said that Bob Linscott was very unhappy with it. How do we know Bob Linscott was very unhappy with it, counsel? That's the issue in this case at this juncture on the admission of that statement. How do we know that? Did Mr. Gilles say anything to you about any conversation with him or what?
THE WITNESS [Torres]: Well, he said he had conversation with Bob and that he was very unhappy.
THE COURT: Motion is denied.

Under sec. 908.01(2), Stats., "declarant" is defined as a person who makes a statement. The statement is hearsay if it is one not made by the declarant while testifying at trial, offered to prove the truth of the matter asserted. Sec. 908.01(3), Stats. For the purposes of examining this contention, Gilles is deemed to be the declarant.

█ The trial court admitted Gilles statement as told by Torres under the exception to the hearsay rule set forth in sec. 908.045(2), Stats.[6] In order for a hearsay statement to be admitted as an exception to the rule in the context of this case, (1) the statement must narrate, decide or explain an event or condition; (2) the event or condition must be recently perceived; and (3) the declarant must make the statement in good faith. Linscott asserts that the foundational requirements contained in the hearsay exception rule were not satisfied. We agree.

█ While perhaps conceding, as is urged by Torres, that explaining how a person is "upset" or "unhappy" is the equivalent to explaining a condition, Linscott nevertheless points to the totality of the statement, "That Bob Linscott was very unhappy with the whole situation and that I could expect something to happen," and argues that the statement primarily concerns a state of mind. We agree. The statement does nothing more than reflect Linscott's reaction to the contractual dispute he was having with Torres, and thus his state of mind regarding the differences of opinion that existed.

---

[6]Section 908.045, Stats., provides in relevant part:

Hearsay exceptions; declarant unavailable. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

. . .

(2) Statement of Recent Perception. A statement, not in response to the instigation of a person engaged in investigating, litigating, or settling a claim, which narrates, describes, or explains an event or condition recently perceived by the declarant, made in good faith, not in contemplation of pending or anticipated litigation in which he was interested, and while his recollection was clear.

Of equal importance, Torres has failed to demonstrate that the statement relates to a recently perceived event. Because Torres admitted he did not know when Linscott spoke with Gilles, the statement was not shown to be related to a recently perceived event. For the above reasons, we conclude that the statement was inadmissible under sec. 908.045(2), Stats., and its admission was a misuse of discretion by the trial court.

Linscott next contends that the improper admission of the hearsay evidence affected the jury's determination in the defamation action and the judge's decision to submit punitive damages to the jury. We disagree with his conclusion that absent the hearsay statement, there was insufficient credible evidence to support either determination.

Even though the trial court erred in admitting the evidence, "in determining the necessity for a new trial due to the admission of prejudicial evidence, the effect of the inadmissible evidence should be weighed against the totality of the sufficient credible evidence supporting the verdict." *Sumnicht v. Toyota Motor Sales U.S.A., Inc.,* 121 Wis. 2d 338, 377, 360 N.W.2d 2, 20 (1984).

We first examine if the hearsay statement had any effect in the defamation action. The jury determined that each of the five statements was defamatory. The trial court instructed the jury that even though the statements were defamatory, Linscott had a privilege to make the statements about Torres to protect his own business. This privilege would be abused if Linscott knew at the time he made the statements that they were false, or if he made them in reckless disregard of their truth or falsity. The jury found that Linscott abused this privilege.

On appeal, Linscott describes the hearsay declaration as portraying him "as a person bent on revenge for the conflict between the two over the scope of their licensing agreements." He asserts that the hearsay evidence must have caused the jury to believe he doubted the truth of his statements.

Linscott accords the hearsay statement greater effect than is warranted, and we conclude it is susceptible to more than one interpretation. The evidence includes the agreements existing between the parties, Linscott's acknowledgement of Torres' rights, and Linscott's admission to changing his own custard formula. Even without the hearsay statement, the record amply reflects sufficient credible evidence for the jury to find Linscott could have doubted the truth of his statements, and to support a determination of defamation.

We next examine whether there was sufficient evidence despite the hearsay statement to warrant the trial court's submission of the punitive damage questions. Because this is a question of law, we owe no deference to the trial court's determination. *Walter v. Cessna Aircraft Co.,* 121 Wis. 2d 221, 230–31, 358 N.W.2d 816, 821 (Ct. App. 1984). "Only where there is proof of malice or willful, wanton, reckless disregard of plaintiff's rights can punitive damages be considered." *Wangen v. Ford Motor Co.,* 97 Wis. 2d 260, 275, 294 N.W.2d 437, 446 (1980).

Linscott realized and appreciated that Torres was authorized to use the Gilles Frozen Custard trademark as long as, in the judgment of Gilles, minimum quality standards were maintained. There was no evidence that these minimum standards were not maintained. To the contrary, Dr. Bradley, a professor in food science at the University of Wisconsin—Madison, testified that he thought Torres produced "an

79

outstanding product." The trial court did not need to rely on the hearsay statement to conclude that Linscott was upset over the contractual dispute between himself and Torres.

The record amply reflects Linscott's consultation with his lawyers about his claims. His complaints were lodged either directly with Torres or to Torres through Gilles or his widow. Although Linscott removed the first marquee sign at about the time that Gilles called him to relay Torres' objection to the signs, the menu board sign was put up in February 1983, and although altered in content because of Torres' complaint, remained up at least through the trial proceedings.

By testimony, Linscott attempted to show that his motivation for the five different advertisements was to differentiate his custard from Torres'. Nevertheless, Linscott's promulgating five distinct statements in sequence after the contents of the previous signs had been objected to because of the message conveyed, when added to all the other circumstantial evidence, provided a reasonably sufficient evidentiary basis to demonstrate a reckless disregard for Torres' rights and thus an adequate basis to submit the issue of punitive damages to the jury.[7]

---

[7]We note that the jury could not have accorded the hearsay statement very much weight in finding express malice. The jury did not find that the first advertising statement, put up in January 1983, was issued with express malice, even though this act occurred shortly after the statement was made. Of all the advertising statements, the jury only found that the flier was issued with express malice. Since this occurred at least a year after the statement was made, it is unlikely that the hearsay statement influenced the jury's finding.

80

## INCONSISTENT VERDICT

Linscott's last contention is that a new trial is required because the verdict was inconsistent. His basis for this claim is that the same five statements were found to cause pecuniary loss in the claim for false advertising but not in the defamation claim.

In the defamation claim, the jury awarded $10,000 in damages to compensate Torres for humiliation, mental anguish, and/or damage to reputation but not any damages for "actual pecuniary loss." This award is not inconsistent with the award of $18,000 in damages for pecuniary loss from Linscott's false advertising.

Linscott argues that Torres rested both claims on only one item—lost profits. We disagree. There is ample evidence in the record that Torres was being challenged about his product and on his rights to sell Gilles Frozen Custard. This evidence would support a claim for humiliation and/or damage to his reputation.

"An inconsistent verdict is a term of art used in describing jury answers that are logically repugnant to one another." *Fondell v. Lucky Stores, Inc.,* 85 Wis. 2d 220, 228, 270 N.W.2d 205, 210 (1978). We do not consider the jury's different assessment of damages for the different claims logically repugnant. Therefore the jury's verdict was not inconsistent and a new trial is not required.

*By the Court.*—Judgment affirmed.