Catherine Fʀɪᴄᴀɴᴏ, Plaintiff-Respondent,

v.

Bᴀɴᴋ ᴏғ Aᴍᴇʀɪᴄᴀ NA, Defendant-Appellant.

Court of Appeals

*No. 2015AP20 Submitted on briefs November 16, 2015.—Decided December 23, 2015.*

**2016 WI App 11**

(Also reported in 875 N.W.2d 143.)

753

On behalf of the defendant-appellant, the cause was submitted on the briefs of *David M. Potteiger* of *Bass & Moglowsky, S.C.*, Milwaukee, *Jon H. Patterson* and *Marc James Ayers* of *Bradley Arant Boult Cummings LLP*, Birmingham, AL, and *Edmund S. Sauer* of *Bradley Arant Boult Cummings LLP*, Nashville, TN.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *S. Todd Farris* and *Joseph M. Peltz* of *Friebert, Finerty & St. John, S.C.*, Milwaukee.

Before Neubauer, C.J., Reilly, P.J., and Hagedorn, J.

¶ 1. NEUBAUER, C.J. Bank of America N.A. (the Bank) appeals from a judgment in favor of Catherine Fricano on her WIS. STAT. § 100.18(1) (2013–14)[1] deceptive representation claim. A jury found the Bank's deceptive representation in the sale contract induced Fricano to enter into the purchase of a home from the Bank and awarded her compensatory damages for extensive water and mold damage despite the "as is" and exculpatory clauses in the parties' contract. We reject the Bank's challenge to the trial court's denial of its postverdict motions. There was sufficient

---

[1] All references to the Wisconsin Statutes are to the 2013–14 version unless otherwise noted.

evidence to support the jury's verdict that the Bank made a deceptive statement concerning the sale of the property with the intention of inducing the sale of the property and that Fricano suffered a loss as a result of that representation. The "as is" and exculpatory clauses in the parties' contract do not, as a matter of law, relieve the bank/seller of liability under § 100.18(1) for its deceptive representation in the contract which induced agreement to such terms. We affirm.

## BACKGROUND

### *The Bank's Knowledge of "Severe Water Damage" to the Property*

¶ 2. The Bank acquired the Menomonee Falls property in foreclosure for $235,000. The Bank hired real estate agent James Morgan to list the property for sale. When Morgan visited the property on February 3, 2012, he discovered that the property had suffered "sever[e] water damage." A Menomonee Falls fire department report prepared the previous day recounted the damage:

> Through front window, you could see ceilings that had fallen in family room .... Found ceilings down throughout first floor with pooling throughout. Plumbing fitting in the ceiling appeared to have given way. Second floor had similar wet floors, especially in master bath .... Basement had moderate amount of water leaking down and soaked floors.

A water bill from the village of Menomonee Falls for the quarter ending on February 29, 2012, showed the amount of water used at the property was 246,500 gallons. On February 6, 2012, Morgan e-mailed

Michael Hitt, the Bank's asset manager for the property, about the water damage and advised that "quick clean up . . . would save the property from any mold issues." Morgan attached photographs depicting the damage to the property.

*The Bank's Efforts to Remediate the Property*

¶ 3. Morgan solicited bids to remove damaged items from the property, and on March 7, 2012, the Bank approved a bid to "trashout" the property. Attached to the bid were numerous photographs of the property.

¶ 4. When the "trashout" was not completed by April 4, 2012, Morgan e-mailed the Bank asking for an "update on the clean out bids." He advised the Bank that "[w]ith all the moisture this is going to turn quickly into a mold remediation situation."

¶ 5. After a May 8, 2012 e-mail noting that the "[t]rash-out could not be completed at this time because of the mold issue," the Bank approved a bid for mold remediation. While Morgan initially informed the Bank that the mold remediation "appear[ed] to be complete," meaning that he did not see any visible signs of mold, he subsequently advised the Bank that, in fact, the mold remediation work "was not a complete job." He noted that there was additional mold showing on the living room ceiling, kitchen, and basement.

¶ 6. The Bank subsequently approved repair work, including installing cabinets, countertops, sinks, plumbing; replacing the drywall in the living room, master bedroom, and kitchen; installing a vinyl floor in the kitchen; installing carpeting in the living room, master bedroom, and on the stairs; and painting the

living room, master bedroom and kitchen, among other things. Morgan informed the Bank on September 3, 2012, that the repair work had been completed, but he found it to be unsatisfactory.

### The Showing of the Property

¶ 7. On September 19, 2012, the Bank approved a listing agreement with Morgan for sale of the property at a listing price of $144,900. By that time Morgan did not recall seeing or smelling any signs of mold at the property.

¶ 8. Once the property was listed, it generated a great deal of interest. Fricano contacted her real estate agent, Brian Roslawski, to set up a showing. The next day, Fricano, her fiancé Leo Pagoudis, and Roslawski visited the property. When they arrived, there were at least a dozen other people viewing the property. While walking through the property, Roslawski saw some discoloration in the basement that appeared to be mold, which he pointed out to Fricano and Pagoudis, but he did not see any other mold in the basement or on the first or second floors. Pagoudis noticed a smell of mustiness to the basement and observed mold along the wall in the stairwell leading to the basement, in the sump crock, and on entire pieces of the drywall. Fricano also acknowledged seeing mold in the basement. Fricano and Pagoudis liked the property and they asked Pagoudis' brother, who had experience purchasing foreclosed homes and renovating them, to accompany them during a second walk-through of the property later that day. After the second walk-through, Pagoudis' brother said that if Pagoudis and Fricano did not make an offer, he would.

*Fricano Offers to Purchase the Property and the*
*Bank Denies Knowledge of the Condition*
*of the Property*

¶ 9. The next day, September 23, 2012, Fricano signed a WB-11 Residential Offer to Purchase, offering $171,111 to purchase the property. There were thirteen other offers submitted to the Bank. Bidders were then asked to make their highest and best offer. Fricano increased her offer to $175,111, memorialized in a WB-44 Counter-Offer. In an e-mail dated October 4, 2012, the Bank notified Fricano that her "offer ha[d] been accepted." Attached to that e-mail for Fricano to sign were the Bank of America Real Estate Purchase Addendum (Addendum) and the Water Damage, Toxic Mold Environmental Disclosure, Release and Indemnification Agreement (the Agreement). The Addendum and the Agreement contained an "as is" clause, along with a number of disclaimers or exculpatory clauses, stating as follows:[2]

> [T]he Buyer acknowledges and agrees to accept the Property in "AS IS" condition at the time of closing including without limitation, any hidden defects or environmental conditions affecting the Property, whether known or unknown, whether such defects or conditions were discoverable through inspection or not. The Buyer acknowledges that the Seller and its agents, brokers and representatives have not made, and the Seller specifically negates and disclaims, any representations, warranties, promises, covenants, Agreements or guarantees, implied or express, oral or written, with respect to:
>
> (A) The physical condition or any other aspect of the Property including, but not limited to . . . water

---

[2] The terms exculpatory clause and disclaimer are used interchangeably.

leaks, water damage, mold or any other matter affecting the stability or integrity of the Property . . . .

Mold may have been removed or covered in the course of any cleaning or repairing of the Property . . . . Seller does not in any way warrant the cleaning, repairs or remediation, or that the Property is free of Mold . . . . Buyer has not in any way relied upon any representations or warranties of Seller or Seller's employees, officers, directors, contractors, representatives, broker or agents concerning the past or present existence of Mold or any environmental hazards in or around the Property.

. . . .

The Buyer is purchasing the Property solely in reliance on [her] own investigation and inspection of the Property and not on any information, representation or warranty provided or to be provided by the Seller . . . .

Neither the Seller, nor its servicers, employees, representatives, brokers, agents or assigns, has made any representations or warranties, implied or express, relating to the condition of the Property or the contents thereof.

. . . .

Seller hereby advises Buyer that the Property (including, but not limited to, the basement) is or may be affected by water or moisture damage, toxic mold and/or other environmental hazards or conditions . . . [and] the Property may be or has been irrevocably contaminated with mildew, mold, and/or other microscopic organisms.

. . . .

Buyer agrees that the purchase price of the Property reflects the agreed upon value of the Property AS-IS taking into account the aforementioned disclosures.

. . . .

> Buyer further acknowledges that Seller has not made
> and does not make any express or implied representa-
> tions or warranties of any kind with respect to the
> environmental condition of the Property . . . . [T]o the
> fullest extent permitted by law, Buyer . . . hereby for-
> ever waives and fully releases Seller . . . from and
> against any and all claims . . . arising from, in connec-
> tion with, or in any way relating to any known or
> unknown conditions of the Property, including but not
> limited to, the existence of toxic mold, and/or any other
> environmental hazards or conditions on the Property.

In addition to the foregoing, the Bank represented that it acquired the property by foreclosure and consequently it had *little or no direct knowledge about the condition of the [p]roperty.* (Emphasis added.) Fricano discussed the Addendum and the Agreement with Roslawski who told her that this language was "very common with foreclosures." Pagoudis recalled Roslawski explaining to him and Fricano that banks do not always give real estate condition reports when they lack knowledge about the condition of the property. Fricano then signed the Addendum and the Agreement and returned them to the Bank. On October 9, 2012, the Bank signed the Addendum and the Agreement, along with Fricano's WB-44 Counter-Offer.

### *Fricano Has the Property Inspected*

¶ 10. Fricano hired a home inspector who advised that it was "obvious the ceilings and walls in the home have been subject to a water leakage event resulting in substantial mold growth." He noted that the wall coverings in the basement had been removed, the ceilings in the kitchen and in the living room had been replaced, as had the walls in the master bedroom

and master bathroom. In the basement, there was "evidence of mold at some of the wall coverings that were not removed," including "an area near the sump crock and . . . near the stairway." The wall coverings between the stairway and the living room also showed mold growth, portions of which were being used by the heating system. The inspector recommended that Fricano consult an environmental professional in order to determine what mitigation efforts might be necessary.

¶ 11. Fricano contacted another contractor who visually examined the property and prepared a job proposal to "[s]afely remove or antimicrobial treat and encapsulate water damaged building materials in basement and first floor staircase," which included a "Dry-Out" for a minimum of seven days in order to return the basement and living areas to nonfungal producing moisture levels. Fricano, however, did not pursue the proposal because the contractor did not indicate that there was any evidence of mold on the first or second floors and, thus, she "believed that there was no mold within any of the livable areas of the home and that there was some areas within the basement." Fricano moved forward with the purchase of the property, closing on the property on December 12, 2012.

### The Commencement of this Action and Trial

¶ 12. Shortly after the closing, while meeting with a contractor about replacing the kitchen cabinets, Fricano discovered mold "saturated" throughout the house. As a result, the house was stripped down to the studs, the mold and water damage was remediated, and the interior of the house was reconstructed.

¶ 13. Fricano then commenced the instant action alleging a claim pursuant to WIS. STAT. § 100.18(1).

Among other things, Fricano alleged that the Bank misrepresented to her in the Addendum and the Agreement it prepared and sent to her for signature that it had "little or no direct knowledge regarding the condition of the [p]roperty." In fact, Fricano alleged, the Bank had actual knowledge that the property had been flooded and that, as a result, it had been damaged.

¶ 14. The matter proceeded to trial. After the close of all evidence, the trial court instructed the jury on the "as is" clause as follows:

> An 'as is' clause does not relieve the defendant, Bank of America, from a duty to disclose a material adverse fact about the property.
>
> Catherine Fricano still has the burden of proof to prove that Bank of America had knowledge of the condition of the property and failed to disclose it. The buyer is entitled to rely upon a statement by the defendant, Bank of America, that it has no knowledge about the property. Bank of America may not use an as-is clause to relieve the bank of its responsibility to disclose conditions about the condition of the property. In these situations, the exculpatory clause still may have evidentiary value for the purpose of showing that no representations were relied upon.

¶ 15. The trial court also instructed the jury on the elements of a WIS. STAT. § 100.18(1) claim: the Bank must have published or placed before one or more members of the public an untrue, deceptive, or misleading statement or representation concerning the sale of the property with the intention of inducing the sale of the property, and Fricano must have suffered a loss as a result of that statement or representation. *See K & S Tool & Die Corp. v. Perfection Mach. Sales, Inc.*, 2007 WI 70, ¶ 19, 301 Wis. 2d 109, 732 N.W.2d 792.

¶ 16. The jury returned a verdict in favor of Fricano on the WIS. STAT. § 100.18(1) claim and awarded her $50,000 in compensatory damages.

### The Bank's PostVerdict Motion

¶ 17. The Bank moved pursuant to WIS. STAT. § 805.14(5)(b) for judgment in its favor on the WIS. STAT. § 100.18(1) claim notwithstanding the jury's verdict and pursuant to § 805.14(5)(c) to change the jury's answer. The Bank argued (1) that the Addendum expressly disclaimed Fricano's claim that the Bank's statement that it had little or no direct knowledge about the condition of the property was untrue, deceptive, or misleading; (2) that at the time the Bank made this statement Fricano was not a member of the public because her counteroffer had already been accepted and, thus, she and the Bank had a "particular relationship"; and (3) that the evidence presented was insufficient to establish that the statement the Bank made materially induced Fricano to purchase the property because by the time the statement was made Fricano had already submitted a legally binding offer and counteroffer to purchase the property.

¶ 18. The trial court denied the Bank's motion.

## ANALYSIS

### Standard of Review

¶ 19. Appellate review of a trial court's denial of a motion for judgment notwithstanding the verdict is de novo, applying the same standards as the trial court. *Logterman v. Dawson*, 190 Wis. 2d 90, 101, 526

763

N.W.2d 768 (Ct. App. 1994). A motion for judgment notwithstanding the verdict "does not challenge the sufficiency of the evidence to support the verdict." *Management Comput. Servs., Inc. v. Hawkins, Ash, Baptie & Co.*, 206 Wis. 2d 158, 176, 557 N.W.2d 67 (1996). Rather, such a motion "admits for purposes of the motion that the findings of the verdict are true, but asserts that judgment should be granted the moving party on grounds other than those decided by the jury." Id. at 177 (citation omitted). Thus, a court should enter judgment notwithstanding the verdict "where the facts found by the jury are not sufficient as a matter of law to constitute a cause of action." Id. In this regard, the Bank argues that it is entitled to judgment notwithstanding the verdict because (1) the "as is" and exculpatory clauses within the Addendum and the Agreement bar Fricano's WIS. STAT. § 100.18(1) claim and, (2) by the time the Bank misrepresented its knowledge of the condition of the property, Fricano was not a member of "the public." While the Bank also references the denial of its earlier summary judgment motion, it does not develop any independent argument based on its motion.

¶ 20. Review of the Bank's motion to change the jury's verdict is governed by "the traditional any-credible-evidence standard." *General Star Indemn. Co. v. Bankruptcy Estate of Lake Geneva Sugar Shack, Inc.*, 215 Wis. 2d 104, 122, 572 N.W.2d 881 (Ct. App. 1997) (citation omitted).

¶ 21. A motion directed toward the sufficiency of the evidence shall not be granted "unless the court is satisfied that, considering all credible evidence and reasonable inferences therefrom in the light most favorable to the [nonmoving party], there is no credible

evidence to sustain a finding in favor of such party." WIS. STAT. § 805.14(1). Although the same standard applies both to the trial court and to the appellate court reviewing the trial court's ruling, because "the trial court is in a better position to decide the weight and relevancy of the testimony," its ruling is accorded "substantial deference." *See Allied Processors, Inc. v. Western Nat'l Mut. Ins. Co.*, 2001 WI App 129, ¶ 12, 246 Wis. 2d 579, 629 N.W.2d 329. Utilizing this standard, the Bank argues that there was legally insufficient evidence to support the jury's findings that Fricano was materially induced into purchasing the property and that it was the Bank's intent to so induce her.

*The Addendum and the Agreement Do Not Bar Fricano's WIS. STAT. § 100.18(1) Claim as a Matter of Law*

■

¶ 22. The Bank challenges denial of its postverdict motion, contending that Fricano cannot recover under WIS. STAT. § 100.18(1) as a matter of law because the Addendum and the Agreement state that she bought the property "as is" and she disclaimed any representations regarding the condition of the property.

■

¶ 23. We see no support for the Bank's argument that the "as is" provision, disclaimers, and waivers in the parties' contract relieve it from WIS. STAT. § 100.18(1) liability for its deceptive statement in the contract that it had little to no knowledge of the condition of the property. In *Grube v. Daun*, 173 Wis. 2d 30, 61, 496 N.W.2d 106 (Ct. App. 1992), we held

that, in the context of common law misrepresentation claims, when a seller makes "an affirmative representation about some aspect of the property, the buyer is entitled to rely upon that statement and expect full and fair disclosure of all material facts relating to that aspect of the property." A falsely induced "as is" clause does not preclude liability. *Id.* The exculpatory clause may have evidentiary value for purpose of showing that the representations were not relied upon. Id. While not specifically addressed, the plaintiffs in *Grube* were permitted to pursue their § 100.18(1) claim based on the same alleged false statements regarding the condition of the property. *Grube,* 173 Wis. 2d at 62–63.

■■

¶ 24. The logic of *Grube* as applied to common law misrepresentation claims is equally applicable to a Wis. Stat. § 100.18(1) claim. Section 100.18 is a fraud-based statute, with a "broad remedial scope" and "protective purpose." *Tim Torres Enters., Inc. v. Linscott,* 142 Wis. 2d 56, 72, 416 N.W.2d 670 (Ct. App. 1987). Remedial statutes such as § 100.18 are to be "liberally construed to advance the remedy that the legislature intended to be afforded." *Stuart v. Weisflog's Showroom Gallery, Inc.,* 2008 WI 22, ¶ 21, 308 Wis. 2d 103, 746 N.W.2d 762. We can perceive of no reason—and the Bank offers none—why falsely induced "as is" and exculpatory clauses should necessarily bar, as a matter of law, liability for deceptive statements made in violation of Wisconsin's deceptive trade practices statute.[3]

---

[3] This view is broadly shared. For example, in *Elendt v. Green Tree Servicing, LLC,* 443 S.W.3d 612, 617–20 (Ky. Ct. App. 2014), the court held that the plaintiffs, by agreeing to purchase a mobile home "as-is," did not assume the risk of

¶ 25. *Peterson v. Cornerstone Property Development, LLC*, 2006 WI App 132, 294 Wis. 2d 800, 720 N.W.2d 716, upon which the Bank relies, does not advance the Bank's position. To the contrary, in *Peterson* we affirmed *Grube*'s holding that an "as is" clause is not a complete bar to misrepresentation claims when the seller makes affirmative misrepresentations. *Peterson*, 294 Wis. 2d 800, ¶ 38. Unlike here, the case involved application of disclaimer and integration clauses that provided that the parties could rely on the written terms of the contract, including warranties, but expressly disclaimed reliance on, and excluded extrinsic evidence of, precontract representations that varied the terms of the contract. There, the disclaimer and integration clauses "clearly, unambiguously, and unmistakably" informed the signer of what was being waived— precontract misrepresentations. *Id.*, ¶ 36 (citation omitted). Ultimately, the court found that dismissal of the plaintiff's claim was appropriate because she never specified any affirmative precontract misrepresentations the seller made; rather, she repeated only generalities from the complaint, that the defendant made "representations and omissions" that entitled her to relief under WIS. STAT. § 100.18(1). *Peterson*, 294

---

being intentionally and actively deceived in violation of the state's consumer protection act. *See also Sheehy v. Lipton Indus., Inc.*, 507 N.E.2d 781, 786 n.8 (Mass. App. Ct. 1987) ("as is" clause would not, as a matter of law, bar a claim brought under state's statute prohibiting deceptive acts or practices); *Murray v. D & J Motor Co.*, 958 P.2d 823, 832 (Okla. Civ. App. 1998) ("as is" clause is not a defense to a claim alleging deceptive and unfair trade practices under the state's consumer protection statute); *Morningstar v. Hallett*, 858 A.2d 125, 131, ¶ 15 (Pa. Super. Ct. 2004) ("as is" clause did not necessarily preclude an unfair trade practices claim).

767

Wis. 2d 800, ¶ 39 & n.9 (the plaintiff "fail[ed] to specify what those alleged representations or omissions were or even reference portions of the record to indicate exactly what she is referring to").

¶ 26. Here, Fricano identified the Bank's misrepresentation that it had "little or no direct knowledge regarding the condition of the [p]roperty" in the same document containing the "as is" and other exculpatory provisions. It is this "affirmative representation that constitue[s] a viable Wis. Stat. § 100.18 claim." *Peterson*, 294 Wis. 2d 800, ¶ 38. Fricano claimed that she relied on this statement in agreeing to disclaim and waive reliance on the Bank's representations because she was told the Bank had little to no information—which is indisputably false. There is nothing in the "as is" provision, the disclaimers or the waivers that "clearly, unambiguously and unmistakably" informed the buyer that she was not entitled to rely on the representation in the sale contract itself, a representation that induced agreement to precisely those exculpatory provisions.[4]

---

[4] Because we decide this case on the narrow ground that the "as is" and other exculpatory clauses do not bar the Bank's liability under Wis. Stat. § 100.18(1) based on the misrepresentation in the document itself, we need not analyze whether this type of misrepresentation would be actionable if made precontract under the specific language of the contract—the "as is" provision, the disclaimers, waivers and releases, and the public policy analysis applicable to common law tort claims set forth in *Grube v. Daun*, 173 Wis. 2d 30, 60, 496 N.W.2d 106 (Ct. App. 1992), and *Peterson v. Cornerstone Property Development, LLC*, 2006 WI App 132, ¶ 36, 294 Wis. 2d 800, 720 N.W.2d 716. Likewise, we need not address whether these clauses are ever permitted to defeat a statutory deceptive trade practices claim —given the legislative purpose in providing protections beyond common law misrepresentation claims—and, as suggested by *Grube*'s separate public policy analysis of the common law

*The Bank's Misrepresentation was*
*Made to "the Public"*

■■

¶ 27. The Bank argues that, as a matter of law, its misrepresentation was not made to "the public" because by the time it made the misrepresentation it had a "particularized relationship" with Fricano. The Bank argues that Fricano had made an offer, followed by a counteroffer increasing her offer price, and the Bank had accepted that last writing in the October 4, 2012 e-mail. Fricano, for her part, argues that the Bank did not accept her counteroffer until October 9, 2012, and, thus, she was still a member of "the public." The Bank replies that the critical point is not whether the e-mail created a legally binding contract but that the parties' negotiations and the Bank's written acceptance within the e-mail created a "particular relationship."

■■■■

¶ 28. One of the necessary elements of a Wis. Stat. § 100.18(1) claim is that the representation be made to "the public." Section 100.18 does not define who is a member of "the public." *K & S Tool & Die Corp.*, 301 Wis. 2d 109, ¶ 20. It "does not necessarily mean a large audience." *Kailin v. Armstrong*, 2002 WI App 70, ¶ 44, 252 Wis. 2d 676, 643 N.W.2d 132. In fact, a statement made to a single person may constitute a statement made to "the public." Id. A person remains a member of "the public" until a "particular relationship" exists between that person and the defendant. *K & S Tool & Die Corp.*, 301 Wis. 2d 109, ¶ 27; *Kailin*, 252

---

misrepresentation claims, with a "careful balancing of principles of contract and tort law," and a statutory § 100.18(1) claim. *Grube*, 173 Wis. 2d at 60.

Wis. 2d 676, ¶ 44. The determination of who is a member of "the public" depends "upon its own peculiar facts and circumstances and must be tested by the statute in the light of such facts and circumstances," *K & S Tool & Die Corp.*, 301 Wis. 2d 109, ¶ 27 (citation omitted), keeping in mind that the purpose of § 100.18 is to compensate members of "the public" who, as a result of "untrue, deceptive, or misleading state-ments," are induced to take certain actions, *Kailin*, 252 Wis. 2d 676, ¶ 44. Thus, once a person has made a purchase or entered into a contract, any statements made thereafter cannot be said to have caused that person to make that purchase or enter into that contract. Id.

■■

¶ 29. There was no contract between the parties when the Bank misrepresented its knowledge of the condition of the property. A contract is formed when there is a meeting of the minds as to its terms, and an acceptance that varies the terms of the offer consti-tutes a rejection and a counteroffer. *See Household Utils., Inc. v. Andrews Co.*, 71 Wis. 2d 17, 28–29, 236 N.W.2d 663 (1976); *Leuchtenberg v. Hoeschler*, 271 Wis. 151, 155, 72 N.W.2d 758 (1955). Thus, no con-tract is formed until the counteroffer is accepted. *Leuchtenberg*, 271 Wis. at 155. As Fricano correctly contends, when the Bank sent the Addendum and the Agreement containing its misrepresentation via its October 4, 2012 e-mail, there was not yet a binding contract between them. After Fricano increased her offer to $175,111, memorialized in the WB-44 Counter-Offer, the Bank sent Fricano the October 4, 2012 e-mail indicating that it had "accepted" the counteroffer, but, because the Addendum and the Agreement contained a variation of terms of the

agreement, that acceptance was, in fact, a rejection and a counteroffer. Thus, there was no contract at the time the Bank misrepresented its knowledge of the condition of the property. *See K & S Tool & Die Corp.*, 301 Wis. 2d 109, ¶ 26 ("a plaintiff is no longer a member of 'the public' for the purpose of WIS. STAT. § 100.18(1) once he or she has entered into a contract to purchase the offered item").

¶ 30. The Bank relies on *Cousins Subs Systems Inc. v. Better Subs Development Inc.*, No. 09–C-0336, 2011 WL 4585541 (E.D. Wis. Sept. 30, 2011), to support its position that even before a contract is formed, if the parties are in negotiations, then a "particular relationship" exists. Initially, "federal district court cases are not binding authority on this court." See *State v. Wood*, 2010 WI 17, ¶ 18, 323 Wis. 2d 321, 780 N.W.2d 63. In any case, *Cousins Subs* is not persuasive because we fail to understand how the fact that parties are in negotiations over terms takes the potential purchaser out of the realm of "the public." The point of negotiations is to induce the other party to enter into the contract by making certain demands and concessions. *See K & S Tool & Die Corp.*, 301 Wis. 2d 109, ¶ 20 (stating that a prospective purchaser is a member of "the public" unless that person's relationship to the defendant is such that it is evident the legislature did not intend to protect a person in that relationship from deceptive practices). Presumably, if Fricano had refused the additional terms contained in the Addendum and the Agreement, the Bank would have moved on to the next highest bidder of the thirteen other bids that had been made. In other words, there was nothing particular about the relationship between Fricano and the Bank at that moment. Thus, we cannot conclude

that the legislature did not intend to extend the protections of Wis. Stat. § 100.18(1) to purchasers in these circumstances. *K & S Tool & Die Corp.*, 301 Wis. 2d 109, ¶ 20 (noting that "the public" has been interpreted broadly). Moreover, even if we were to agree with the holding of *Cousins Subs* as applied to the facts of that case, we find the "peculiar facts and circumstances" of that case, involving sophisticated buyers who purchased the right to develop twenty-two franchise restaurants, *Cousins Subs*, 2011 WL 4585541, *2–4, to be so different from the "peculiar facts and circumstances" of this case to make it distinguishable, *K & S Tool & Die Corp.*, 301 Wis. 2d 109, ¶ 27 (citation omitted). Accordingly, we reject the Bank's contention that, as a matter of law, its misrepresentation was not made to "the public."

*Legally Sufficient Evidence Supports the Jury's Finding that the Bank's Misrepresentation Induced Fricano into Purchasing the Property*

¶ 31. Next, the Bank argues that, based on the timing and content of its misrepresentation, there was legally insufficient evidence to show that Fricano was materially induced into buying the property. A Wis. Stat. § 100.18(1) claim requires proof that the misrepresentation caused the plaintiff a pecuniary loss. *K & S Tool & Die Corp.*, 301 Wis. 2d 109, ¶ 19. The test to be applied is whether the plaintiff would have acted in its absence. Wis JI—Civil 2418. Although the misrepresentation need not be the sole or only motivation for the plaintiff's decision to buy the property, "it must have been a material inducement." Id. In other words, the misrepresentation "must have been a significant factor contributing to [the plaintiff's] decision." Id.

772

¶ 32. The Bank's contention that its misrepresentation could not have materially induced Fricano into buying the property because her offer had already been accepted is without merit. As already discussed, the Bank's acceptance of Fricano's counteroffer was, in fact, a rejection of that counteroffer and a new offer, since it sought to alter the terms of Fricano's counteroffer by requiring her to sign the Addendum and the Agreement.

¶ 33. Nor is there merit to the Bank's contention that the substance of the misrepresentation could not have materially induced Fricano into purchasing the property. Fricano's WB-11 Residential Offer to Purchase included representations for the Bank's signature that it had no notice or knowledge of conditions, such as defects, affecting the property other than those identified in the real estate condition report. Fricano, however, agreed to forego these protections when she agreed to sign the Addendum and the Agreement containing the Bank's misrepresentation that it did know about the condition of the property. She testified that she did so because the property had been in foreclosure and, as such, thought the Bank could not tell her anything about the property, as it represented. Thus, after viewing "all credible evidence and reasonable inferences therefrom in the light most favorable" to Fricano, Wis. Stat. § 805.14(1), and giving "substantial deference" to the trial court because it was "in a better position to decide the weight and relevancy of the evidence," *K & S Tool & Die Corp.*, 301 Wis. 2d 109, ¶ 29, there is more than sufficient credible evidence to believe that had the Bank not misrepresented its knowledge of the condition of the property, Fricano would not have gone forward.

¶ 34. Relatedly, the Bank argues that Fricano's reliance on its misrepresentation was unreasonable as a matter of law because she had notice of a possible defect in the property through the home inspectors who examined the property, obligating her to inquire further. The reasonableness of a person's reliance on a misrepresentation is not a separate element of a WIS. STAT. § 100.18(1) claim, but relevant only to the consideration of the third element: whether the representation materially induced the plaintiff's pecuniary loss. *Novell v. Migliaccio*, 2008 WI 44, ¶ 50, 309 Wis. 2d 132, 749 N.W.2d 544. In other words, in some cases "a plaintiff's belief of a defendant's representation is unreasonable, and as a result the plaintiff's reliance (which is based on the unreasonable belief) is also unreasonable." *Id.*, ¶¶ 51–52 (using the example of relying on the representation that a Superman cloak could permit the purchaser to fly). But it cannot be said here that Fricano's belief of the Bank's misrepresentation that it had no knowledge regarding the condition of the property rendered reliance unreasonable as a matter of law. As Fricano explained during her trial testimony, when she showed the Addendum and the Agreement to her broker, Roslawski, he told her that this language was "very common with foreclosures." In other words, Fricano had no reason to doubt that the Bank lacked knowledge of the condition of the property because, as common sense dictates, banks that acquire properties through foreclosure are not living there, unlike the ordinary person selling his or her home. Nor does the fact that Fricano had two inspectors examine her home render her reliance unreasonable as a matter

of law.[5] The jury could have credited the testimony Fricano presented that, after having one person inspect the property and consulting with another, coupled with the Bank's representation that it lacked knowledge of the condition of the property, she thought the mold growth was limited to portions of the basement. The Bank's misrepresentation did not have to be the sole motivation for Fricano's decision to purchase the property. She could have relied on both her own investigation and the Bank's misrepresentation.

*Legally Sufficient Evidence Supports the Jury's Finding that the Bank's Misrepresentation was Made with the Intent to Induce Fricano into Purchasing the Property*

¶ 35. Finally, again relying on the timing and content of its misrepresentation, the Bank argues that there was insufficient proof that its misrepresentation was intended to induce Fricano into purchasing the property. This argument also fails. As already discussed, the misrepresentation was made before there existed a binding contract between the parties. Further, viewing all credible evidence and reasonable inferences therefrom in the light most favorable to Fricano, there was sufficient evidence for the jury to have found that the misrepresentation was intended to induce Fricano into purchasing the property. The Bank's misrepresentation cannot be viewed in a vacuum. The evidence showed that the Bank knew

[5] For support, the Bank cites to *Dillhyon v. Dunn*, No. 2011AP1175, unpublished slip op. (WI App Feb. 1, 2012), an unpublished per curiam opinion of this court. Unpublished per curiam opinions, however, "may not be cited in any court of this state as precedent or authority." Wis. Stat. Rule 809.23(3).

that a pipe had burst at the property, causing "severe water damage" and mold infestation. While the Bank attempted to remediate the mold, it was unsuccessful. Then, as Morgan's testimony showed, rather than remediating the property further, the jury could have found that the Bank decided to cover up the mold with cosmetic repairs. There was sufficient evidence upon which the jury could have concluded that all of these actions were designed to make the property marketable for sale and are evidence that the Bank's misrepresentation was intended to induce Fricano to purchase the property. *See generally K & S Tool & Die Corp.*, 301 Wis. 2d 109, ¶ 19.

## CONCLUSION

¶ 36. We reject the Bank's contention that it was entitled to judgment in its favor dismissing Fricano's Wis. Stat. § 100.18(1) claim notwithstanding the jury's verdict or based on a change in the jury's answer and affirm the judgment.

*By the Court.*—Judgment affirmed.